### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

FEB 0 4 2004

MAC SURGICAL, INC., an Illinois
Corporation, and MICHAEL
CAMPAGNA, an Individual,

      Plaintiffs,

vs.

CARL ZEISS SURGICAL, INC., a New
York corporation, and ERIC TIMKO, an
Individual,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**04C 0854**

COURT FILE NO. _____

JUDGE NORGLE

MAGISTRATE JUDGE BOBRICK

### COMPLAINT AND JURY DEMAND

Plaintiffs MAC Surgical, Inc. ("MAC Surgical") and Michael Campagna ("Campagna"),

for their causes of action against Defendants Carl Zeiss Surgical, Inc. ("Zeiss"), and Eric Timko

("Timko"), state and allege as follows:

### INTRODUCTION

Campagna has been a distributor of medical equipment since 1994. Campagna founded

MAC Surgical in November 1998. On June 1, 2002, MAC Surgical signed a Distribution

Agreement ("Agreement" or "DA") with Zeiss, attached hereto as Exhibit 1. This Distribution

Agreement designated MAC Surgical as the Zeiss distributor of surgical microscopes for

northern Indiana, the top one-third of Illinois, the Upper Peninsula of Michigan, and all of

Wisconsin.

MAC Surgical was illegally and wrongfully terminated as a Zeiss distributor on May 21,

2003, for reasons that have never been explained to Campagna by Defendants. As a result of this

termination and disparaging comments made by Defendants, MAC Surgical lost not only its



product line with Defendant Zeiss, Inc. and other smaller product lines, but also lost two other crucial product lines with The Anspach Effort, Inc. ("Anspach") and Elekta Instruments, Inc. ("Elekta").

Upon information and belief, MAC Surgical was terminated because of Defendants' desire, and ability, to install the Central Regional Vice President of Operations for Zeiss, Michael Sodini ("Sodini"), as the distributor in MAC Surgical's territory, thus allowing Sodini to make the commissions that MAC Surgical would have realized after it had invested more than $100,000 and thousands of hours developing Zeiss products in its territory. In doing so, Defendants disparaged Plaintiffs and provided ill advice to Campagna in attempts to prevent MAC Surgical from optimizing its sales. Additionally, Defendants violated Plaintiffs' contractual provisions and statutory rights to effectuate MAC Surgical's wrongful termination.

Despite the fact that MAC Surgical was a shining star amongst distributors, Defendants terminated MAC Surgical without good cause, notice or an opportunity to cure, as required by applicable Illinois law. Additionally, as a franchisor, Defendants did not provide the neccessary disclosures required by Illinois and New York law. More specifically, this is an action that seeks relief from Defendants, on account of Defendants' (a) violation of the Illinois Franchise Disclosure Act, Ill. Comp. Stat. § 705/1 *et. seq.*; (b) violation of the New York State Franchise Sales Act, N.Y. Gen. Bus. L. § 680 *et. seq.*; (c) breach of MAC Surgical's Distribution Agreement with Zeiss; and, (d) disparagement of MAC Surgical and its president, Campagna.

## PARTIES

1.      Plaintiff MAC Surgical, Inc. is, and was, at all relevant times an Illinois corporation engaged in the business of distributing medical operating microscopes, drills, surgical screws and screwdrivers, radiosurgical head frames, related accessories, and other

medical products. It is located at 211 Clinton Avenue, Oak Park, Illinois 60302.

2. Plaintiff Michael Campagna is, and was at all relevant times, the President of MAC Surgical. Campagna is a resident of this District, residing at 211 Clinton Avenue, Oak Park, Illinois 60302, in the county of Cook, State of Illinois.

3. Defendant Carl Zeiss Surgical, Inc. is a New York corporation, with its principle place of business located at One Zeiss Drive, Thornwood, New York 10594. Zeiss is in the business of manufacturing, marketing and selling medical operating microscopes and related accessories and other medical products.

4. Defendant Eric Timko is, and was at all relevant times, the President of Carl Zeiss Surgical, Inc. Timko, upon information and belief, is a resident of the State of Connecticut, and resides at 9 Falls Drive, Brookfield, Connecticut 06804-1347

5. Nonparty Michael Sodini was the Central Regional Vice President of Operations for Carl Zeiss Surgical, Inc., and now is the Zeiss distributor in MAC Surgical's former territory.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial number of the acts and transactions forming the basis of the complaint took place in this District.

7. Defendants are subject to jurisdiction in this District because they engaged in the wrongful acts alleged in this Complaint within this District, causing injury within this District; they contracted to provide goods or services in this District; and, they offered or sold, or participated in the offer or sale, of franchises within this District.

## FACTUAL BACKGROUND

### The Beginning of MAC Surgical

8.     On or about October 1994, after leaving a distribution career outside of the medical industry, Campagna secured a position with Anspach, marketing cranio-facial implants to oral surgeons.  Within six months, Campagna was promoted to representing Anspach's core product line, surgical high-speed drills for orthopedic and neurological surgery.

9.     Campagna also became the sole Anspach sales representative for the entire northern section of the state of Illinois.  Upon information and belief, it normally takes years of effort by a sales representative to attain the level at which Campagna reached in less than a year. As a showing of the enormous amount of business Campagna was able to develop for Anspach, disposable monthly orders of drill bits grew from less than $1,000 per month in orders when Campagna began in 1994, to $65,000 in monthly drill bit orders alone by 2002.

10.     In October 1998, Campagna formed his distributorship company, MAC Surgical. Shortly thereafter, MAC Surgical added another product line, Kinamed, Inc. (hereinafter "Kinamed").  With Kinamed, MAC Surgical sells surgical screws and screwdrivers.

11.     In MAC Surgical's first year distributing Kinamed products, it had generated $137,000 in total sales.  By MAC Surgical's second year, it generated $250,000 in total sales. Since the beginning of MAC Surgical's relationship with Kinamed, MAC Surgical was, and remains, the top distributor in the nation.

### MAC Surgical's First Relationship with Zeiss

12.     Upon information and belief, most distributorships around the nation build themselves around a large capital equipment or high revenue large implant line, such as the product line manufactured by Zeiss.  This type of product line generates large commissions.

Distributorships also have a secondary line of surgical power equipment, such as the product line manufactured by Anspach. Such a product line typically generates monthly renewable business and a steady source of income. Additionally, smaller product lines can generate revenue, but require significantly more continuing development than a primary line. MAC Surgical had a secondary line with Anspach, but was still hoping for a primary line.

13. In June 1999, Campagna approached Zeiss in attempts to sell Zeiss' line of surgical microscopes. Campagna wrote Defendants a letter expressing his interest (attached hereto as Exhibit 2), but, upon information and belief, was given scant consideration at that time. MAC Surgical was nevertheless still growing, and Campagna hired another employee, Jerry Summers ("Summers") to assist him.

14. In January 2001, Campagna was approached by another Zeiss distributor, John Sonnenberg (hereinafter "Sonnenberg") regarding subcontracting MAC Surgical to Sonnenberg's Zeiss distributorship, Great Lakes Surgical ("Great Lakes").

15. Sonnenberg had acquired his Zeiss distributorship after having been the Zeiss National Sales Manager. Upon information and belief, Sonnenberg is merely one of many former Zeiss employees who left Zeiss' corporate offices to become a distributor.

16. In February 2001, MAC Surgical began to sell Zeiss surgical microscopes as a subcontractor for Great Lakes. Upon information and belief, Timko did not like the arrangement because it was a violation of the Zeiss' contract with Great Lakes that disallowed subcontractors. However, upon information and belief, Timko allowed the arrangement between MAC Surgical and Great Lakes because the President of Anspach, Chuck McGarrity (hereinafter "McGarrity" or "Anspach President") resoundingly endorsed Campagna. Timko also informed Campagna that Campagna was significantly scrutinized and an exhaustive check into his reputation and

background had been conducted.

17.     In March 2001, at the Interurban Meeting of Chicago Area and Illinois Neurosurgeons, Campagna met Sodini, who at this time (and at all times until he became the Zeiss distributor in MAC Surgical's territory) was the Central Regional Vice President of Operations for Zeiss. Sodini explained that it was Zeiss' national strategic goal to create a Zeiss "Center of Excellence" at Northwestern Memorial Hospital (hereinafter "Northwestern"), the largest hospital in the Chicago area and a key basin for Zeiss' main competitor. Sodini also explained that Zeiss was not successful in speaking with Doctor Batjer, the head of the Neurology department at Northwestern, and also one of the most renowned surgeons in the country. Sodini asked Campagna to approach Doctor Batjer at this meeting, in front of Campagna's competitors. Campagna was successful in doing so.

18.     At this same meeting of neurosurgeons, Campagna learned that Illinois was a major market for Zeiss products, yet the state suffered from the worst market penetration in the Zeiss network. Upon information and belief, Zeiss had acquired a dismal reputation for heavy handedness, arrogant negotiation, expensive service, and untimeliness in the area covered by MAC Surgical's future Zeiss Territory.

19.     Throughout this meeting, Campagna received excellent feedback from his surgeon customers regarding Zeiss' decision to work with MAC Surgical. Upon information and belief, also at this Meeting, Doctor Charbel, the new Chairman of Neurology for the University of Illinois, told Sodini that bringing MAC Surgical on board with Zeiss was the best possible thing Zeiss could have done.

20.     However, one of Sonnenberg's Zeiss sales representatives for Illinois, Courtney Duncan ("Duncan") informed Campagna that Sonnenberg had told her and other Zeiss

distributors that within six months, MAC Surgical would cease to exist, and that it was Sonnenberg's plan that his Zeiss distributorship would be the Anspach distributor (the product line then distributed by MAC Surgical) for the entire area. After confronted with the information by Campagna several days later, Sonnenberg admitted that he indeed made the above statement to Duncan and others.

21. Sure enough, it was not long before Campagna realized that Sonnenberg contributed heavily to Zeiss' poor reputation in the area. For instance, Campagna observed what he believed to be shoddy sales practices, wherein Sonnenberg's price quoting would be inflated or included equipment that the hospital was not interested in. Upon information and belief, Sonnenberg would personally mishandle a situation, and thereafter blame it on one of his employees and fire that employee. These are merely a few examples of the litany of misdeeds Campagna saw by Sonnenberg, and upon information and belief, were known, and approved of, by Defendants.

22. After one such instance, Campagna decided to discontinue his relationship with Sonnenberg. In June of 2001, Campagna informed Timko and Sodini that MAC Surgical was ending its relationship with Sonnenberg. Campagna arranged a personal meeting in New York, on August 3, 2001, where he paid his own travel expenses from Chicago. At this meeting, Timko asked to see Sonnenberg's contract with Campagna (attached hereto as Exhibit 3). Upon reading it, Timko gestured to Sodini and stated, "Look at this. I told him specifically not to do this."

23. Also in this meeting, Timko guaranteed that MAC Surgical would be paid for the deals worked on by MAC Surgical when the deals came in. For example, MAC Surgical worked on the sale of a Visu 200 to Carle Clinic in Urbana, Illinois. Upon information and belief, the

Visu 200 was delivered, but MAC Surgical was never paid. Sodini then asked Campagna how he would have handled things as a distributor, Campagna pointed out that he had a one-year non-compete clause in his contract with Sonnenberg. Surprisingly, even after Campagna informed Timko of his non-compete clause with Sonnenberg, Timko asked Campagna to possibly continue with Zeiss without working for Sonnenberg.

24.     Campagna quickly realized that, upon information and belief, Timko's offer to stay with Zeiss was because Zeiss knew that their goal of a "Center for Excellence" at Northwestern would not be realized if Campagna announced to Northwestern that he was no longer with Zeiss. (Campagna had sold sixteen (16) list price drills to Northwestern and commanded 100% of the Craniofacial Plating business for Anspach at Northwestern.)

25.     In light of his non-compete, Campagna wrote Timko a letter on the plane home from this meeting, explaining his thoughts on the possibility of representing Zeiss, informing Timko that Campagna would not accept Timko's offer (attached hereto as Exhibit 4).

26.     Almost a year after Campagna's meeting with Timko and Sodini, on or about the second week of May 2002, Sodini contacted Campagna seeking him to interview against another candidate for the position of distributor for Zeiss.

### MAC Surgical's Year Without Zeiss

27.     Between the June 2001 meeting and the May 2002 contact, MAC Surgical focused on its Anspach line. Most notably, MAC Surgical had been able to secure business for Anspach in every hospital that MAC Surgical worked with as a Zeiss distributor for Great Lakes. Such hospitals included Carle Clinic in Urbana, Rush Presbyterian in Chicago, Sarah Bush Lincoln Health Center in Matoon, and St. Joseph in Bloomington. MAC Surgical gained momentum and manufacturers were calling Campagna seeking to have MAC Surgical distribute

its products. However, MAC Surgical kept its options open and continued to look for a good primary line to supplement its secondary Anspach line.

28. By the conclusion of 2001, MAC Surgical was one of the top three Anspach distributors in the nation. MAC Surgical, with only two (2) sales representatives, was third only to an Anspach distributorship with thirteen (13) sales representatives, and another with seven (7) sales representatives.

29. In April 2002, the American Academy of Neurosurgeons ("AANS") Annual Meeting was held in Chicago. MAC Surgical sent out a mass mailer to every neurosurgeon in its territory (attached hereto as Exhibit 5). MAC Surgical also prepared a dossier on its accomplishments for presentation at the meeting (attached hereto as Exhibit 6). MAC Surgical knew how to penetrate the market and was very successful at doing so.

30. Campagna corresponded with large, primary line companies following the AANS meeting, including Zeiss, each of them courting MAC Surgical as its distributor. These companies included Elekta, Surgical Dynamics, Olympus America, and Blackstone Medical. MAC Surgical eventually chose Zeiss.

<u>MAC Surgical's Distributorship with Zeiss</u>

31. After a brief period of further consideration by both parties, Zeiss and MAC Surgical executed a Distribution Agreement on June 1, 2002 (see Exhibit 1). (Defendants issued an addendum to the Agreement on November 13, 2002, attached hereto as Exhibit 7.)

32. As a new Zeiss distributor, Campagna took over the territory previously served by Sonnenberg's distributorship. In hiring MAC Surgical, Timko referred to an exhaustive search that Zeiss conducted, informing Campagna that they had found "the right man for the job."

33. In making his decision to choose Zeiss over the many other manufacturers

courting MAC Surgical, Campagna relied on the custom in the industry and a course of dealing between the parties, whereby Zeiss allowed its distributors to remain as the sole distributor of Zeiss products in their trade area, so long as the distributor was performing. Additionally, Campagna saw that Sonnenberg was retained as a dealer even after Zeiss was aware that he violated direct orders from Timko in executing an unauthorized agreement to subcontract with MAC Surgical. Furthermore, Campagna knew that Sonnenberg remained a distributor for almost a year after Campagna revealed to Timko and Sodini the information described above.

34. Timko also spoke of the whittled down prestige and reputation of Zeiss in MAC Surgical's new territory. Timko also assured Plaintiffs of Zeiss' long-term commitment towards MAC Surgical, and of Timko's desire for continuity and stability to counter the years of neglect to customers.

35. Shortly after becoming a Zeiss distributor, Campagna asked Timko what type of "manpower" commitment he was looking for in MAC Surgical. Timko quickly countered with "Michael, our contract is with you; whatever you do, however you do it, at the end of the year. I don't care if you hire twenty people, or if you sell everything yourself . . . it's up to you to produce our numbers." (Timko again stated this, almost word for word, to Campagna at a National Sales Meeting in October 2002.)

36. As part of the arrangement for acquiring the Zeiss distributorship, Campagna agreed to provide Sonnenberg with half of all of MAC Surgical's commissions on capital sales for the first three months MAC Surgical was a distributor. Because of this, and because it usually takes months for Zeiss to process the commissions due to distributors, it would be several months before MAC Surgical would receive any payment from Zeiss. Knowing that it would take a significantly increased amount of cash flow to achieve the sales numbers required by

Zeiss, Campagna invested $100,000 in MAC Surgical to begin his Zeiss distributorship.

37.     MAC Surgical also hired additional employees, including Chris Danko ("Danko") and Todd Precour ("Precour"), both formerly employees of Sonnenberg.  Through Sodini, Timko heavily pressured Campagna into hiring both of these employees, referencing Zeiss' desire for continuity.  Campagna also hired Tracy Gasior ("Gasior") as a sales representative, who was formally a sales representative with Zeiss' main competitor, Leica, and Kelly McFadden ("McFadden") as an office manager for MAC Surgical.

38.     Campagna was also pressured by Sodini to hire Michelle Wannish ("Wannish"), a former sales representative for Sonnenberg.  Campagna did not have a position available, but to meet the "continuity" demand made by Zeiss, he offered to pay her 15% of commissions on the sale of a Visu 200 microscope to Highland Park Hospital when MAC Surgical was paid the commission.  Prior to the commission being paid to MAC Surgical, Wannish moved out of the area.  Regardless, in January 2003, when MAC Surgical received the commission, Campagna located Wannish and sent her a check for $1,262.28, the 15% commission (attached hereto as Exhibit 8).

MAC Surgical's Distribution Agreement with Zeiss

A.     General Obligations and Fees

39.     The Distribution Agreement between MAC Surgical and Zeiss, signed by Campagna on behalf of MAC Surgical and Timko on behalf of Zeiss, contains certain obligations that were required of MAC Surgical.  Such obligations included:

> **4.01 Best Efforts.**
> Distributor shall use its best efforts to market and sell the products throughout the Territory and shall devote such time and efforts with respect hereto as may be reasonable [sic] required.  In order to adequately perform its responsibilities under this Agreement, Zeiss requires that the Distributor and Distributor's principle officers shall not be active participants in other business ventures.

DA/Exhibit 1 § 2.01.

**4.13 Minimum Sales Requirement.**
The Distributor will be required to achieve a minimum Product sales requirement ("Minimum Sales Requirement" or "MSR") for a **twelve-month period** beginning on the Effective Date. The MSR is set forth in Schedule D. **Thereafter**, Zeiss and Distributor shall review the MSR on a quarterly basis. Based upon the quarterly reviews, Zeiss may, at its sole discretion, adjust MSR.

If, during the term of this Agreement, Distributor fails to meet the MSR, Zeiss may terminate this Agreement with immediate effect.

DA/Exhibit 1 § 4.13 (emphasis added).

40.     Zeiss also required that Zeiss products represent MAC Surgical's main revenue source. See DA/Exhibit 1 § 2.02(a). Third party sales could only represent a maximum of 40% of MAC Surgical's gross revenues. See id. Zeiss also prohibited the sale of competitive products by its distributors. See DA/Exhibit 1 § 2.02(b).

41.     Additionally, Zeiss set a Minimum Sales Requirement (MSR) of $6,000,000.00 for MAC Surgical's first year, according to Schedule D of the Distribution Agreement. Thereafter, Zeiss and MAC Surgical were to review the MSR on a quarterly basis. See DA/Exhibit 1 § 4.13.

42.     The Distribution Agreement also outlined several conditions under which such sales must be made, including:

**6.03 Sales Quotations.**
Distributor will issue all sales quotations exclusively by using Zeiss' proprietary quotation program. Zeiss shall provide Distributor with copies of its order confirmation and shipping notification.

DA/Exhibit 1 § 6.03. Additionally, all purchase orders were regulated by Defendants, and were subject to Defendants' acceptance under the terms set forth in Zeiss' order confirmation. See DA/Exhibit 1 § 6.02.

43.    Zeiss strictly regulated the price at which all products were sold. This was contractually contained in section 6.01 of the Distribution Agreement, requiring adherence to a price list when making price quotations to customers. This price regulation also included a limitation on price discounting. MAC Surgical always had to obtain approval from Sodini to discount products.

44.    Zeiss provided MAC Surgical with tools to assist MAC Surgical in identifying itself as a Zeiss distributor. The Distribution agreement granted to MAC Surgical a right and license to use the trademarks and trade names under which the Zeiss products were sold. See DA/Exhibit 1 § 9.01. For example, at the request of MAC Surgical, Zeiss sent large logos for MAC Surgical's use in the window of its office. Additionally, MAC Surgical used display products from Zeiss in its sales efforts.

45.    Campagna talked with, and sought the advice of Sodini, as Zeiss' Regional Vice President of Operations, on a daily basis regarding customer relations issues. Additionally, every product MAC Surgical sold included a Zeiss warranty. MAC Surgical had to consult with Zeiss when a product was returned for repair. The repairs were done by and paid for by Zeiss.

46.    In addition to the advice provided directly to MAC Surgical, Zeiss also frequently sent bulletins to its distributors, including MAC Surgical, with sales advice and information about Zeiss products. Defendants asked Campagna to submit an article to the September 2002 edition of the Zeiss newsletter, which he did. (attached hereto as Exhibit 9). Zeiss also had the option to invite MAC Surgical to participate with Zeiss in various advertising efforts, publicity campaigns, and exhibitions. See DA/Exhibit 1 § 5.02. As a brief summary of some of the terms of the relationship between MAC Surgical and Zeiss, Zeiss provided to MAC Surgical: training programs, limitations on products or services to be sold, advertising assistance, mandated prices

13

or credit practices, customer relations advice, and warranty advice.

47.     As a supplement the day-to-day information provided by Zeiss, Zeiss also required MAC Surgical sales representatives to attend a Zeiss training, called "Fast Focus." See DA/Exhibit 1 § 5.03. The Distribution Agreement further required all of MAC Surgical's sales personnel to receive training by Zeiss within three months of beginning to sell the product. See DA/Exhibit 1 § 4.07. MAC Surgical paid to send Campagna and Summers to one such mandatory training. MAC Surgical paid for the travel expenses of Campagna and Summers to attend this required "Fast Focus" training, when subcontracting for Sonnenberg. (Zeiss paid for the hotel rooms.) MAC Surgical was asked to pay $10,000 to Zeiss towards the "Pangea training," which represented half of the total cost of $20,000, but was terminated before the training or billing occurred. (Other employees were hires within the Zeiss system and accordingly already had the training.) Campagna was preparing to send his newest employee to the training when MAC Surgical was terminated.

48.     Schedule H of the Distribution Agreement outlines the "Co-operative Bonus Points Program," which provides for the accumulation of "points" for .1% of MAC Surgical's sales. Each point is worth a dollar and can be used towards "Zeiss-approved" purchases. Campagna accumulated many such points, and faced with losing the money contributed to this fund, Campagna used the points to purchase Zeiss binoculars for his employees. Under this "Co-operative Bonus Points Program," MAC Surgical forfeited the "points" (e.g. dollars) that remained in its account if not used within three months of the end of Zeiss' business year. MAC Surgical never had the opportunity to use the points it accumulated in 2003, which, upon information and belief, was in excess of $500.00.

49.     One of MAC Surgical's employees, Precour, was a member of the Zeiss National

Sales Council (a four or five person council, selected by Zeiss from the top sales producers in the nation). These members were not allowed to discuss certain disclosures made by Zeiss or other members at the meeting with their employers, the distributors. Precour traveled to Zeiss' headquarters on at least two occasions for purposes of the Sales Council, while employed by MAC Surgical. MAC Surgical was never reimbursed by Zeiss for one of these trips, costing MAC Surgical approximately $600.00.

50.     As yet another example of the many expenditures MAC Surgical had to make as a requirement of being a Zeiss distributor, at the 2002 Zeiss National Meeting, Hawaiian shirts were the required dress for the Opening Luau. MAC Surgical paid for silk Hawaiian shirts for all its employees, including Sodini, at a cost of over $600.00.

51.     As part of the relationship between the parties, Zeiss required MAC Surgical to pay a fee for demonstration stock. According to Section 4.12 of the Addendum to the Distribution Agreement, MAC Surgical had to pay 5% of the balance due on demo products if MAC Surgical retained the demonstration stock for more than 150 days. MAC Surgical continued to receive bills after it was terminated, for demonstration stock that MAC Surgical gave to Sodini after its termination. Specifically, MAC Surgical was charged "interest fees" for demonstration stock allegedly in MAC Surgical's possession for more than 150 days.

52.     Zeiss also required MAC Surgical to use the "Scopes" software program for issuing sales quotations. See DA/Exhibit 1 § 6.03; § 4.16. This program is outdated and therefore can only be operated in certain computers. MAC Surgical purchased the program and an old computer used by Sonnenberg for $500 and only Zeiss had the software available.

53.     Perhaps the most significant fee MAC Surgical paid to Zeiss was in the form of "administrative fees" for "national account discounts." As part of the limitation on price

discounting, a portion of MAC Surgical's standard commission was withheld as payment to Zeiss when a product was sold at a discounted rate. Specifically, MAC Surgical had to pay 25% of the discounted amount. In other words, MAC Surgical had to <u>pay Zeiss</u> the difference between MAC Surgical's normal commission and the reduced commission MAC Surgical received for selling discounted products. In one such instance, on September 27, 2002, MAC Surgical actually <u>paid Zeiss $8,507</u> on a sale because the amount of commission earned by MAC Surgical was less than 25% of the discounted amount, as reflected on page nine of the September 2002 Commission Report (attached hereto as Exhibit 10).

54.     Another such example occurred on January 8, 2003, as evidenced on pages twelve and thirteen of the January 2003 Line-Item Detail report from Zeiss (attached hereto as Exhibit 11). Campagna made numerous requests to Zeiss to provide materials to MAC Surgical hospital clients that would increase the user-friendliness of the Zeiss equipment. Campagna knew that the lack of such supplies was a source of revenues for Zeiss' competitors, and Campagna was attempting to combat this Zeiss weakness. Campagna's requests were frequently not honored. However, Zeiss finally did provide the requested supplies on January 8, 2003, but recorded the sale of these materials as one to MAC Surgical, instead of directly to the hospitals. For all of Campagna's efforts to increase the satisfaction of Zeiss customers, MAC Surgical had to <u>pay Zeiss $360.36 in administrative fees</u>.

55.     Prior to October 2002, Zeiss collected administrative fees on a quarterly basis. As shown in the February 2003 Zeiss Incentive Report (attached hereto as Exhibit 12), <u>MAC Surgical paid Zeiss $9,322.38 for the fourth quarter of 2002 alone</u>. Campagna had to deduct his share of the fees from his commission paycheck and his employee's share of these fees from their commission checks.

56.     Upon information and belief, the excessive fees paid by distributors were a source of discontent amongst most, if not all, Zeiss distributors. As discussed in further detail below, Campagna's recommendation that distributors unite together against these hidden franchise fees is, upon information and belief, one of the reasons for MAC Surgical's illegal and wrongful termination.

57.     Astonishingly, in sum, MAC Surgical paid Zeiss fees totaling thousands of dollars in "administrative fees," in order to continue and remain a Zeiss "distributor."

B.      Termination

58.     The Distribution Agreement between MAC Surgical and Zeiss contained the following provisions regarding termination:

**13.     DURATION AND TERMINATION OF THIS AGREEMENT.**

**13.01   Term of Agreement; Automatic Termination.**
Unless terminated earlier pursuant to this paragraph, **this Agreement shall be valid from the Effective Date to and until September 30, 2004**, at which time this Agreement will automatically terminate. It is contemplated by the parties that they will review their relationship during the months immediately preceding its automatic termination to determine whether and on what terms the relationship may be continued upon mutual agreement for successive terms of two (2) years from the original termination date, unless otherwise agreed by the parties. Nothing in this Agreement will be construed to require either party to agree to any such extension, and Distributor expressly agrees that the duration of the Agreement as set forth above is sufficient to enable it to realize a satisfactory return on any investment it has made or may make in connection with the establishment and operation of its Distributorship.

**13.02   Termination Upon Notice.**
This Agreement may be terminated without cause by either party at the end of any calendar month without cause on not less than sixty (60) days' notice to the other party. If such termination is initiated by Zeiss, Distributor shall be entitled to a phase-out, as per section 13.04 herein below. The effective date of termination shall be sixty (60) calendar days after the date of written notice and in accordance with Paragraph 14 of this Agreement.

**13.03   Immediate Termination.**

This Agreement may be terminated by either party with immediate effect upon the **material breach** of this Agreement by the other party **if such breach is not cured within ten (10) days of notice thereof; or by Zeiss with immediate effect if: (i) Distributor fails to meet the Minimum Sales Requirements for the Agreement term as required by paragraph 4.13 hereof;** (ii) Distributor sells products in violation of section 4.10 hereof and/or fails to cease distribution of products that become competitive with those manufactured or distributed by Zeiss or its subsidiaries or affiliates, after Zeiss notifies Distributor of its intention to manufacture or distribute same (iii) Distributor violates the requirements of section 4.14 hereof; (iv) Distributor's financial position substantial deteriorates; (v) Distributor ceases to do business, terminates its existences, dissolves or liquidates; (vi) Distributor becomes insolvent or fails to pay its obligations (including its obligations to Zeiss) when they become due; (vii) a receive is appointed to hold, manage or operate Distributor's property or business; (viii) there is a general assignment of Distributor's property or business for the benefit of its creditors; (ix) proceedings are instituted by or against Distributor under any bankruptcy or insolvency law; (x) Distributor changes ownership in any manner without Zeiss' express written approval of such change; or (xi) violates any other provision of this Agreement, including without limitation, section 4.15 regarding Used Equipment.

**13.04  Phase-Out**
If of termination initiated by Zeiss pursuant to section 13.02 of this Agreement, Distributor shall be entitled to a phase-out period of sixty (60) days from the date of written notice of termination. During the phase-out period, Distributor shall use its best efforts to conclude any open quotes it has previously issued, assist Zeiss as needed in rectifying outstanding customer accounts, and return any unsold demonstration inventory to Zeiss, at Zeiss' expense. At the end of the phase-out period, upon Zeiss' fulfillment of open quotes or orders, Distributor shall be entitled to a commission of fifty (50%) percent of the Distributor's standard commission for any quotations previously generated by Distributor, that result in orders within ninety (90) days of the end of the phase-out period. Zeiss shall have no duty to compensate Distributor for outstanding quotations that do not result in actual sales.

DA/Exhibit 1 § 4.15; § 13 (emphasis added).

59.     Prior to the wrongful and illegal termination of MAC Surgical, Defendants never told Campagna that MAC Surgical's sales numbers were low. While the Agreement provides for notice and an opportunity to cure after low sales numbers, the Agreement only allows for immediate termination according to the provisions of section 4.13, which requires an evaluation after a twelve-month period, and thereafter, on a quarterly basis. See DA/Exhibit 1 § 13.03.

Contrary to the requirements of the Agreement, MAC Surgical was terminated even before reaching that twelve-month period. The Distribution Agreement also provides for a sixty (60) day phase-out period, where MAC Surgical was to be paid for sixty days of commissions upon termination—something else that did not happen. See DA/Exhibit 1 § § 13.02 & 13.04.

60.     Upon information and belief, MAC Surgical was terminated for reasons other than any allegedly low sales numbers or alleged contractual violations of business ethics. Specifically, MAC Surgical was terminated because of Defendants' desire, and ability, to install Sodini as the distributor in MAC Surgical's territory, thus allowing Sodini to make the commissions that MAC Surgical realized after it had invested more than $100,000 and thousands of hours developing Zeiss products in its territory.

61.     Moreover, the Agreement provides that MAC Surgical and Campagna are prevented from selling or marketing any products competitive to Zeiss within the territory for one year from the effective date of termination. See DA/Exhibit 1 § 4.15; § 14. Accordingly, until May 21, 2004, Plaintiffs are contractually prohibited from seeking to replace the product line that represented more than 60% of its income, as required by Zeiss.

### MAC Surgical's Team Approach and Its Success for Zeiss

62.     In just over a year, from 2001 to 2003, MAC Surgical had grown from a two-person team to an eight-person team, generating approximately $8,000,000 to $9,000,000 in yearly revenue.

63.     Campagna utilized a team approach for his employees and rewarded them highly. This approach was very successful. MAC Surgical adopted such mottos as "EVERYONE HELPS EVERYONE ELSE," "OVERWHELM THE CUSTOMER WITH SERVICE AND PROFESSIONALISM," "SERVE THE CUSTOMER, NOT THE QUOTA," and "SERVICE EQUALS SALES." As an example of the

success of the team approach, MAC Surgical secured sales of $700,000 in Zeiss products at Central Dupage Hospital ("Central") in or around September 2002. (MAC Surgical had invested $8,500 in liability insurance to even be allowed to do business at Central.)

64.     This $700,000 sale is such an example of the success of MAC Surgical's team approach. The $700,000 Central sale was one of the single largest sales to one facility that Zeiss had achieved in all of 2002. This was a direct result of MAC Surgical's investment in manpower and money, its strategic use of scarce resources, and its commitment to the team.

65.     At the Zeiss National Sales Meeting, in October 2002, Danko, the primary sales representative on the $700,000 sale to Central, received a sales award before the entire national Zeiss sales force, as a result of the sale to Central. Despite the team's success, Sodini, when given an opportunity to speak, talked about Danko, but never mentioned MAC Surgical.

66.     Campagna had an excellent relationship with his employees. In April 2003, Tony Gomez ("Gomez"), left his employment with a competitor of MAC Surgical. Throughout March and April 2003, MAC Surgical's entire team was involved in the hiring process of Gomez. Gomez had come into contact with MAC Surgical's employees for years, working as a sales representative to a Zeiss competitor in the same area. MAC Surgical's employees provided overwhelmingly positive feedback to Gomez regarding what it was like to work with Campagna and MAC Surgical. This effort concluded with Gomez agreeing to work for MAC Surgical.

67.     As a sign of how highly Zeiss thought of MAC Surgical, MAC Surgical received the first demonstration Sensera, a microscope for E.N.T. surgeons, carrying a list price of approximately $49,000, before any other distributor in the country, despite being the newest Zeiss distributor.

68.     In addition to a good relationship with his employees, Campagna had an excellent

20

relationship with the doctors at the hospitals where Campagna worked. As an example of the business that Campagna brought to Zeiss, Northwest Community Hospital (hereinafter "Northwest") was on the verge of purchasing a neurological microscope from one of Zeiss' competitors. When the surgeons and the staff at Northwest discovered that MAC Surgical was a Zeiss distributor, Northwest switched its purchase to a Zeiss microscope instead of the competitor's microscope.

69.     MAC Surgical increasingly devoted its attention to promoting Zeiss products, often to the detriment of gaining sales on MAC Surgical's other product lines. Campagna felt that these efforts were necessary to produce the results Zeiss required, and also because he was told that he would be rewarded for his efforts, in the form of Defendants' long-term commitment to MAC Surgical's Zeiss distributorship.

70.     MAC Surgical grew in fiscal year 2002 by an amazing 30% and was awarded a $41,500 Incentive Commission for exceeding MAC Surgical's quarterly goals. Only five (5) Zeiss distributorships out of twelve (12) met their objectives in 2002. The second closest distributor to MAC Surgical's performance, Day Surgical, Inc., only achieved a 10% growth. In sum, MAC Surgical grew sales in its territory by 30% in its first six months, showing much greater results than even the Zeiss Distributor of the Year (Day Surgical).

71.     <u>Some distributorships were at a dismal 50% of their 2002 objective and were not terminated.</u> In fact, no dealerships were terminated after the annual sales results were computed and released in 2003.

72.     In June 2002, at the time that MAC Surgical's Distributor Agreement with Zeiss was signed, Timko told Campagna that it would probably take a year for Campagna to "learn" his position. In doing so, Timko told Campagna that a neighboring dealer, Jim Vasko ("Vasko")

21

would be a distributorship against which MAC Surgical would be measured. In 2002, the same year that Zeiss as a company hit 98% of its objective and MAC Surgical hit 130% of its objective, Vasko's dealership only met 50% of its objective. Vasko had been a Zeiss distributor for approximately a year longer than MAC Surgical, and, upon information and belief, remains a Zeiss distributor today.

<u>Defendants' Disparagement of Plaintiffs Begins</u>

73.    At a rare Zeiss distributor-only meeting in April 2003 (approximately a month before MAC Surgical's termination), Campagna talked to the other distributors about uniting together. He suggested that instead of continued squabbling and bickering over territories, that they should join as a body of small, but highly profitable distributors. Additionally, after several distributors raised the issue of the high administrative fees charged by Zeiss, Campagna suggested that distributors unite together to address the issue. Campagna's suggestions followed his traditional team thinking, and he hoped that he had given the other distributors something positive to think about, considering that much of what transpired amongst them was negative.

74.    However, Campagna's comments apparently were not well received. Having performed incredibly well in his first year as a Zeiss distributor, Campagna had alienated his fellow distributors, through causing them to suffer in comparison to MAC Surgical's sales objectives and results. Additionally, Campagna's generous style of management became known and found the ears of the employees of other distributors. Upon information and belief, Campagna's comments and attempt to unite the distributors was told to Defendants.

75.    After this meeting, Sodini became almost impossible for Campagna to reach. Campagna attributed this to Sodini's need to devote his attention to other distributors' concerns, as MAC Surgical was performing better than the other territories.

22

76.     A few weeks later, Campagna had a conversation with an Anspach distributor, who told Campagna, with a nasty tone, that "manufacturers talk" and that Campagna "was not as safe as he thought." When Campagna asked the distributor what he was referring to, he stated that he "shouldn't have even said that" and concluded the conversation.

77.     Additionally, at an Elekta marketing event, Gomez overheard another Zeiss distributor pointing out Campagna to that distributor's sales representatives and saying "that's the one," while pulling his finger across his neck (mimicking throat cutting) and laughing.

78.     Shortly thereafter, Timko called Campagna to tell Campagna that "disturbing information" had come to his attention, as detailed below. Upon information and belief, Defendants had told many of MAC Surgical's employees that MAC Surgical would soon be terminated as a Zeiss dealer and that Sodini would be taking over the territory, long before anything was said to Campagna.

<u>Zeiss' Termination of MAC Surgical</u>

79.     In late April 2003, Campagna was contacted by Timko and asked to not attend a meeting of Zeiss distributors to be held in conjunction with the AANS convention in San Diego. Specifically, one day before this Zeiss meeting was scheduled, Timko telephoned Campagna and told him that "disturbing information" had come to his attention, "information that portrayed MAC Surgical in a disfavorable light" and that consequently, Campagna could not attend the meeting. Timko would not reveal what this information was, despite Campagna's request for him to do so. Campagna wrote Timko a letter in response to the supposed information that expressed Campagna's disbelief at whatever that information might be (attached hereto as Exhibit 13).

80.     At the AANS convention, Timko would again not disclose anything regarding

with the allegation was about, and even acted dismissively about the entire issue. Campagna thought that the issue would blow over, knowing that Campagna not only had not done anything wrong, but MAC Surgical was doing so well for Zeiss.

81.    However, McGarrity, the Anspach President, treated Campagna unfavorably at the AANS convention. (By way of comparison, at the previous AANS convention in 2002, at an Anspach kick-off for a new device, Campagna and all MAC Surgical employees were treated with incredible respect.) Campagna showed McGarrity a detailed list of all the leads MAC Surgical had generated for Anspach. Normally, McGarrity would have been very pleased with the caliber of names on the list, as it included several Chairmen looking to evaluate Anspach's new equipment. Instead, McGarrity stated that he did not care about the list and what he wanted was a "distributor whose people could respect him." McGarrity then referenced Lutheran General Hospital (hereinafter "Lutheran"), and stated, "I've never in all my years been asked to not go into a hospital."

82.    Just after this, Doctor Bauer, a surgeon with Lutheran, visited Campagna at his booth, and Campagna relayed what was said to him by McGarrity. Doctor Bauer was distraught, and told Campagna that his conduct at Lutheran was just fine. Doctor Bauer then stated that he "couldn't believe what Marilyn was pulling." Doctor Bauer concluded by volunteering "have them [Anspach] contact me with any questions." (Marilyn Staerk (hereinafter "Marilyn"), whom Doctor Bauer was referring to, upon information and belief, is a friend of Sonnenberg.)

83.    Thereafter, out of the blue, Timko, along with Sodini and Craig Altschule, Zeiss' Chief Financial Officer, informed Campagna on May 21, 2003 that they were terminating MAC Surgical's distributorship with Zeiss. Upon information and belief, in doing so, Timko said that he would like to commend Campagna on his "calmness and professionalism through this

investigation," and that Campagna earned Timko's "praise for how well [Campagna] conducted himself." But, Timko went on to say "with that being said, we are terminating our contract with immediate effect, as is a provision in your Distributor's Agreement. However, we will graciously extend payment for two month's time on quotes that you provide to us in the next 24 hours. We are not contractually obligated to do so, but with the understanding that you may have bills outstanding, we will extend you this consideration. Of course, we will expect you to pay commissions to your people out of these payments, and trust that you will comply. Do you accept our offer?"

84. When Campagna explained that he did not understand what was going on, Timko replied by referencing a "survey" that was done, and saying, in essence:

> "Michael, you understand how diligently Zeiss searched for a replacement for John Sonnenberg. Our intention was to bring on board someone who could provide stability and professionalism. Apparently, we failed in that selection process with you. Numerous hospitals have called to complain about MAC Surgical, let me correct that, called to complain specifically about you. For that reason, we are severing our agreement."

85. Campagna asked what hospitals and what surgeons Timko was referring to. Timko stated that he could not disclose that information, and that it was "confidential." Campagna asked for Timko to at least disclose the circumstances of the complaints so that Campagna could answer for whatever actions were in question. Timko responded by stating that that was "not possible" either. Timko then reiterated that his decision was final.

86. Campagna replied by stating that he did not intend to sit still. Timko then stated, "if you feel that you would like to pursue legal recourse, I suggest you examine your agreement a bit more thoroughly." There was stillness on the phone, and Timko eventually said:

> "You did not meet your sales objectives. Quite frankly, your numbers left something to be desired. This reason alone is enough for your termination. The offer is ours to withdraw."

87.     Campagna then asked, "what about my people?" Timko replied by stating that Michael's employees had received feedback almost as bad as is, and that " might be one or two who might have been worth continuing with, but we have no plans for MAC Surgical people."

88.     Timko concluded the conversation by telling Campagna that they would need his decision as to whether they had an "agreement" as to his termination and the payment of commissions to MAC Surgical employees. Timko called Campagna again the next morning to strenuously warn Campagna against pursuing a legal claim, warning him that "it would lead to revelations that would potentially destroy you. Not that this is a threat, you understand, merely a friend giving advice."

89.     With one day to accept or deny the terms Zeiss and Timko offered, Campagna signed the letter provided by Zeiss (attached hereto as Exhibit 14), agreeing to pay his employees commissions they would otherwise be due. In contrast to Sonnenberg's chance to defend himself, and an entire year to either cure the problems or face termination, Campagna was never given even a cursory opportunity to do the same.

### Post-Termination

90.     Shortly thereafter, Doctor Haberkampf, with Rush Presbyterian Hospital, called Campagna and informed him that he was outraged and saddened to disclose to Campagna that Michael Sodini had become the new Zeiss distributor and that Gasior and Summers were employed with Sodini. In this conversation, Doctor Haberkampf also stated that he would no longer do business with Zeiss.

91.     The day after Zeiss terminated its contract with MAC Surgical, Campagna called Anspach's McGarrity and informed him of the disheartening turn of events with Zeiss. McGarrity agreed to support Campagna. Campagna later shared this information with two of his

employees, Gomez and McFadden, not knowing that Sodini would too employ them, probably by the end of the day.

92.     It was not long before all but one of Campagna's employees quit; Zeiss constituted 70% of the income of MAC Surgical's sales representatives and these employees were concerned about their own financial security.  When Gasior quit, Campagna asked him about the "survey" Timko referenced.  Gaisor stated, "they were very leading questions.  There wasn't much room to argue with them.  I tried to speak up, but it was yes or no answers only.  It was clear what they wanted.  The writing was on the wall."  Additionally, in Campagna's final conversation with Gomez, immediately before Gomez began his employment with Sodini, Gomez asserted that the rumor was that Campagna was leading a "revolution" against Zeiss and that this is what caused all of Campagna's employees to move to work for Sodini.  Gomez also stated, in reference to Campagna's employees, that they "feel bad for you, but they just need their jobs; they have to pay their mortgages."

93.     Surprisingly, approximately two weeks after MAC Surgical's termination from Zeiss, Campagna, with only his newest employee of six weeks remaining, found himself having to defend himself in front of McGarrity and Tom Hartnett ("Hartnett"), the Anspach Regional Manager.  McGarrity and Hartnett berated Campagna, stating such things as: "your men hate you;" "just how many hospitals have you been kicked out of;" "your doctors hate you, sure one or two like you, but that's all;" "you're a liability."  Campagna showed McGarrity and Hartnett proof of his generosity towards his employees, in the form of contracts with his employees, cancelled checks showing bonuses and health insurance premium payments, cancelled checks showing commissions that were passed straight through to his employees, proof of personal loans to his employees, and his expense sheet.

94.     McGarrity then told Campagna that McGarrity "knew him, and the kind of person that he was, and the job that he did, and that it was obvious that this was a 'palace coup.'" However, McGarrity shortly thereafter informed Campagna that nevertheless, Campagna could not continue as an Anspach dealer because Campagna would have to hire an entirely new workforce, starting over with trainees. McGarrity still offered to pay Campagna for six months after his termination.

95.     Campagna telephoned McGarrity to thank him for listening to his side and paying Campagna for an additional six months. McGarrity stated to Campagna that McGarrity "couldn't believe the things that were being said about Campagna" and that "it would have been wrong to give the Anspach distributorship to Sodini."

96.     Campagna found out some of the things that were being said about him in a telephone conversation with Sodini several weeks after Zeiss' termination of MAC Surgical. Sodini yelled at Campagna during a phone conversation in the first week of June, 2003:

> "you were fired because your men hate you and because a hospital called to complain about you. Don't tell me how to run my distributorship, all you know how to do is lose one! That's why when Lutheran called [. . .]." Silence, then "Why am I even talking to you?"

Sodini then hung up the phone. Contrary to Sodini's statements, as discussed in detail above, Campagna had an excellent relationship with his employees, and with his hospital clients.

97.     When Zeiss terminated MAC Surgical, Campagna lost not only Zeiss, but he also lost Anspach, Eleckta, and Image Stream. Upon information and belief, Sodini, whom Campagna reported to in Sodini's role as Central Regional Vice President of Operations for Zeiss, had formed his own company, Innovative Medical Products ("IMP"). Upon information and belief, IMP is the new Zeiss, Elekta, and Image Stream distributor in MAC Surgical's former territory. Upon information and belief, in addition to taking all but two of MAC Surgical's

product lines (Kinaemd and Anspach), Sodini has also hired away MAC Surgical's entire sales force, with the exception of one newer employee, Gary Moore ("Moore"), who Campagna had to let go with a $1,200 severance payment.

98.    MAC Surgical was finally left with Campagna and only one remaining product line, Kinamed. In August 2003, Bob Bruce (hereinafter "Bruce"), the Vice President of Kinamed, told Campagna that Sodini had called him and "informed" him that Northwestern, the largest account for Kinamed in the nation, which Campagna had personally secured for MAC Surgical and had maintained for three years, was about to switch to Kinamed's competitor for all of their Cranial Flap Fixation equipment. Sodini asserted vigorously that only MAC Surgical's former employee and Sodini's current employee, Gasior, and Gasior's connections could save the account for Kinamed. (Interestingly, none of MAC Surgical's sales representatives sold anything for Kinamed, including Gasior, in the year Gasior was employed by MAC Surgical.)

99.    Fortunately for Campagna, Bruce immediately called Campagna with Sodini's "information." Campagna informed Bruce that Sodini's accusations were entirely false, and that coincidently, Campagna, had just spent three hours at Northwestern with the entire hospital neurological staff, having provided lunch.

100.    The following month, September 2003, MAC Surgical had its highest month ever with Kinamed at Northwestern, and as added more new accounts since June 2003 than any other Kinamed Distributor by a factor of three.. Bruce then gave MAC Surgical the entire state of Wisconsin as part of its territory, which up until then, he was considering giving to Sodini.

<u>Zeiss' Post-Termination Nonpayment of Commissions Due</u>

101.    In terminating MAC Surgical, Defendants never referenced a provision of the Agreement between the parties that allowed for such a termination. However, in their

29

termination letter, Defendants promised MAC Surgical sixty (60) days of commission payments after the date of termination on May 21, 2003. Such a "phase-out" period is similarly provided for in the Agreement. See DA/Exhibit 1 § § 13.02 & 13.04.

102.    On or just before November 18, 2003, Zeiss deposited $21,169.19 in MAC Surgical's bank account via electronic deposit. Zeiss neither informed Campagna of such a deposit, nor informed him of what the deposit was for. Because Campagna did not know the purpose of such funds, he returned the funds to Zeiss with an accompanying letter (attached hereto as Exhibit 15).

103.    Zeiss then reissued the funds, with a letter stating that the funds were for "final" payment of June 2003 commissions (attached hereto as Exhibit 16). Because Campagna was due payment not only for June 2003, but also for July 2003, he promptly returned the funds, with an accompanying letter explaining why the funds were being returned (attached hereto as Exhibit 17). Upon information and belief, because Zeiss did not state what the funds were for when it deposited the $21,169.19 directly into MAC Surgical's bank account, Zeiss was attempting to force Campagna into accepting only partial June 2003 commission payments as payment in full for commissions due.

104.    Campagna thereafter called Zeiss and confirmed receipt of the check and Campagna's correspondence with Melissa Birnbaum, Timko's assistant/secretary. However, Campagna has, to-date, not heard from Zeiss again. Accordingly, Defendants have never provided MAC Surgical with commissions that were promised to Campagna.

105.    Interestingly, the "final" commissions report for June 2003 contained only those commissions for sales that MAC Surgical was aware of, because the purchase orders came through MAC Surgical's fax machine and were then forwarded to Zeiss and Sodini by MAC

30

Surgical. Upon information and belief, more sales on which commissions are due to MAC Surgical occurred in June 2003.

106.    For the foregoing reasons, Plaintiffs accordingly are forced to bring this lawsuit to recover the enormous damages caused by Defendants.

## COUNT I
## VIOLATION OF ILLINOIS FRANCHISE DISCLOSURE ACT (IFDA)
## WRONGFUL TERMINATION

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

107.    The IFDA applies to all franchises in the state of Illinois, regardless of any choice of law provisions in an agreement between the parties. See 815 Ill. Comp. Stat. § 705/4.

108.    The IFDA defines a franchise as a contract or agreement, either express or implied, oral or written, between two or more persons by which:

      (a)    a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and

      (b)    the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

      (c)    the franchisee is required to pay, directly or indirectly, a franchise fee.

See 815 Ill. Comp. Stat. § 705/3(1).

109.    The distribution relationship between MAC Surgical and Zeiss was a franchise because, but not limited to, the following reasons:

      A.    Zeiss' express grant of permission to MAC Surgical to use Zeiss' trademark, and trade names (including designs, graphics, logos and other commercial symbols), as enumerated in Section 9.01 of the Distribution

Agreement;

B. Zeiss' requirement that MAC Surgical's employees attend Zeiss trainings;

C. Zeiss' requirement that MAC Surgical adhere to a price schedule or otherwise obtain permission to discount Zeiss products;

D. Zeiss' collection of "points" based on MAC Surgical's sales;

E. Zeiss' withholding of commissions to MAC Surgical on discounted sales approved by Zeiss, including withholding commissions at such a high percentage of sales as to exceed the commission owed to MAC Surgical, resulting in payment from MAC Surgical to Zeiss; and

F. MAC Surgical's payment of thousands of dollars in "administrative fees."

110. Pursuant to Illinois statutes, it is unlawful for a franchisor such as Zeiss to "terminate a franchise of a franchised business prior to the expiration of its term except for "good cause." 815 Ill. Comp. Stat. § 705/19(a). "Good cause" is specifically limited to failure of the franchisee to comply with any lawful provision of the franchise agreement. 815 Ill. Comp. Stat. 705/19(b).

111. Additionally, with the exception of certain specifically enumerated situations not relevant here, prior to terminating a franchise, a franchisor is required to give a franchisee notice of the franchisee's default or noncompliance with the lawful provisions of the franchise agreement. See id. The notice must state the reasons constituting default or noncompliance and must provide for a 30-day period for the franchisee to cure any claimed deficiencies. See id.

112. MAC Surgical not only was complying will all provisions of the Agreement, but Zeiss unquestionably did not provide MAC Surgical with notice or an opportunity to cure any alleged deficiencies.

113.     Zeiss' violations of 815 Ill. Comp. Stat. § 705/19, 20 include, but are not limited to, the following:

A.     Canceling or terminating MAC Surgical's franchise without cause;

B.     Failing to notify MAC Surgical of any perceived deficiency in MAC Surgical's performance under the written Agreement with Zeiss; and

C.     Failing to provide MAC Surgical with 30 days to rectify any claimed deficiencies.

114.     Plaintiffs are entitled to recover damages sustained as a consequence of Zeiss' violations of Illinois statutes, together with costs and reasonable attorneys' fees.  See 815 Ill. Comp. Stat. § 705/26.

115.     Additionally, under the IFDA, every person who directly or indirectly controls a person liable under the Franchise Act, every partner, principal, executive officer or director of a corporation so liable and other persons operating a similar status or performing similar functions are liable jointly and severally to the same extent as the Franchisor.  Accordingly, the Individual Defendant Timko is equally liable with Zeiss for their violations of the IFDA.

116.     As a direct and proximate result of Defendants' violations of the Illinois statutes, the amount by which Plaintiffs have been damaged, or will be entitled to recover, cannot now be exactly determined, but will be fully demonstrated at a trial on the merits and is sufficient to exceed the threshold of this Court's jurisdiction.

## COUNT II
## VIOLATION OF THE ILLINOIS FRANCHISE DISCLOSURE ACT (IFDA)
## FAILURE TO REGISTER AND DISCLOSE

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

33

117. The Illinois Franchise Disclosure Act, 815 Ill. Comp. Stat. § 705/1 et seq. is a comprehensive statute enacted to ensure that franchisees receive full, complete and truthful information concerning the franchisor and the relationship prior to making an investment in the franchise. The IFDA provides, in particular:

> (1) The General Assembly finds and declares that the sale of franchises is a widespread business activity. Illinois residents have suffered substantial losses where franchisors or their representatives have not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between the franchisor and franchisee, the prior business experience of the franchisor and other factors relevant to the franchise offered for sale.

> (2) It is the intent of this Act: (a) to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered for sale; and (b) to protect the franchisee and the franchisor by providing a better understanding of the business and the legal relationship between the franchisee and the franchisor.

815 Ill. Comp. Stat. § 705/2.

118. The IFDA explicitly provides that it is unlawful for any person to offer or sell a franchise in Illinois unless the offer has been registered or is exempt; that, even if exempt, certain disclosures be made to prospective franchisees; and that it is unlawful for a franchisor to make any misleading statement or omission in connection with the offer or sale of a franchise.

119. Defendants have violated the IFDA in at least the following respects:

    A.    Defendants have not registered the franchise offering with the state; and

    B.    Defendants have not made the disclosures required by law in the form of an Uniform Franchise Offering Circular.

120. As a direct and proximate result of Defendants' violations of the Illinois statutes, the amount by which Plaintiffs have been damaged, or will be entitled to recover, cannot now be exactly determined, but will be fully demonstrated at a trial on the merits and is sufficient to exceed the threshold of this Court's jurisdiction.

## COUNT III
## VIOLATION OF THE NEW YORK STATE FRANCHISE SALES ACT (NYSFSA) FAILURE TO REGISTER AND DISCLOSE

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

121.    The Agreement between the parties, despite applicable Illinois law to the contrary, applies New York law.  See DA § 17.

122.    The New York State Franchise Sales Act ("NYSFSA"), N.Y. Gen. Bus. L. § 680 *et seq.*, is a comprehensive statute enacted to ensure that franchisees receive full, complete and truthful information concerning the franchisor and the relationship prior to making an investment in the franchise.  The NYSFSA provides, in particular:

> It is hereby determined and declared that the offer and sale of franchises, as defined in this article, is a matter affected with a public interest and subject to the supervision of the state, for the purpose of providing prospective franchisees and potential franchise investors with material details of the franchise offering so that they may participate in the franchise system in a manner that may avoid detriment to the public interest and benefit the commerce and industry of the state. Further, it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud or likelihood that the franchisor's promises would not be fulfilled.

N.Y. Gen. Bus. L. § 680.2.

123.    The NYSFSA defines a franchise as a contract or agreement, either express or implied, oral or written between two or more persons by which:

> (a)     A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or
>
> (b)     A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchisee fee.

N.Y. Gen. Bus. L. § 681.3

124. NYSFSA explicitly provides that it is unlawful for any person to offer or sell a franchise in New York unless the offer has been registered or is exempt; that, even if exempt, certain disclosures be made to prospective franchisees; and that it is unlawful for a franchisor to make any misleading statement or omission in connection with the offer or sale of a franchise.

125. Zeiss has violated the NYSFSA in at least the following respects:

(a)   It has not registered the franchise offering with the state;

(b)   It has not made the disclosures required by law in the form of a Uniform Franchise Offering Circular; and

(c)   It has not complied with the exemption requirements by making all of the disclosures required under the NYSFSA.

126. As a direct and proximate result of Defendants' violations of the New York statutes, the amount by which Plaintiffs have been damaged, or will be entitled to recover, cannot now be exactly determined, but will be fully demonstrated at a trial on the merits, and is sufficient to exceed the threshold of this Court's jurisdiction.

## COUNT IV
## BREACH OF CONTRACT AND
## THE COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

127. The Distribution Agreement between MAC Surgical and Zeiss, by operation of law, contains an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in the trade. The implied covenant also prohibits either party from engaging in any conduct or doing anything that deprives the other party of the fruits of the agreement or benefit of the bargain.

36

The implied covenant requires that Defendants act reasonably in the performance of their duties, and, among other things, refrain from terminating Plaintiffs' agreement without good cause.

128. Plaintiffs and Defendants had an agreement, the express and implied terms of which, construed consistently with the covenant of good faith and fair dealing (that is a part of the parties' contract as a matter of law), obligated Defendants to:

    A. Not terminate or refuse to renew the Distribution Agreement between the parties, if Plaintiffs met the conditions stated in the Agreement between the parties;

    B. Allow Plaintiffs to remain as a Zeiss distributor so long as Plaintiffs adequately performed;

    C. Provide reasonable notice and an opportunity to cure deficiencies before terminating, canceling or failing to renew the Distribution Agreement; and

    D. Deal honestly and fairly with Plaintiffs.

129. The Distribution Agreement allowed for evaluation based on a minimum sales requirement only after <u>MAC Surgical had been a distributor for a year</u>. <u>See</u> DA § § 4.13 &13.03. Additionally, Timko told Campagna that he had a year "to learn" the job. Most significantly, Campagna was one of the best performing Zeiss distributors in the nation. The agreement only allowed for automatic termination based on low sales numbers after MAC Surgical had been a distributor for a year. <u>See</u> DA § § 4.13 &13.03.

130. By their conduct, as set forth above, Defendants have breached their contractual duties to Plaintiffs by violating Plaintiffs' reasonable expectations under the Distribution Agreement and by terminating Plaintiffs' franchise without notice, an opportunity to cure, or cause.

131.    As a direct and proximate result of Defendants' breaches of their Agreement, Plaintiffs have suffered damages in the amount yet to be determined, but that will be fully established at the trial on the merits of the case, and which are reasonably estimated to exceed $75,000.

**COUNT V**
**DISPARAGEMENT**

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

132.    Upon information and belief, Defendant Timko and nonparty Sodini under the control of Timko and Zeiss, made disparaging statements to Plaintiffs' employees, customers, and potential customers; other Zeiss distributors; other manufacturers, including, but not limited to, Anspach; and other people in the industry, including, but not limited to, surgeons.

133.    As a direct and proximate result of Defendants' disparagement of Plaintiffs, Plaintiffs have suffered damages in the amount yet to be determined, but that will be fully established at the trial on the merits of the case, and which are reasonably estimated to exceed $75,000.

**COUNT VI**
**VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE**
**TRADE PRACTICES ACT AND THE ILLINOIS CONSUMER**
**FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

134.    Sections 510/2(a)(8) and (12) of the Illinois Uniform Deceptive Trade Practices Act provide:

(a)    A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

38

\* \* \*

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/(a)(8) & (12).

135. Furthermore, Section 505/2 of the Illinois Consumer Fraud and Deceptive Businesses Act provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of such material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 6, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. . . .

815 ILCS 505/2.

136. Section 505/10a(a) of the Illinois Consumer Fraud and Deceptive Businesses Act, in turn, provides:

(a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .

815 ILCS 505/10a.

137. As set forth above, upon information and belief, Defendant Timko and nonparty Sodini, under the control of Timko and Zeiss, disparaged Plaintiffs' goods, services, or business by making false and misleading representations of facts.

138. These actions by Defendants and nonparty Sodini, under the control of Timko and

Zeiss, also created a likelihood of confusion or misunderstanding.

139.    As a direct and proximate result of Defendants' violations of the Illinois statutes, the amount by which Plaintiffs have been damaged, or will be entitled to recover, cannot now be exactly determined, but will be fully demonstrated at a trial on the merits and is sufficient to exceed the threshold of this Court's jurisdiction.

## COUNT VII
## BREACH OF CONTRACT FOR UNPAID COMMISSIONS

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

140.    Defendants had contractual obligations to pay MAC Surgical commissions for sixty (60) days from the date of its termination on May 21, 2003.  MAC Surgical has never received payment for sixty (60) days of commissions due to him for the months of June and July 2003.

141.    As a direct and proximate result of Defendants' non-payment of royalties to Plaintiffs, Plaintiffs have suffered damages in the amount yet to be determined, but that will be fully established at the trial on the merits of the case, and which are reasonably estimated to exceed $75,000.

## COUNT VIII
## PROMISSORY ESTOPPEL

Plaintiffs reallege and incorporate by reference all the allegations set forth in the preceding paragraphs as though fully set forth herein.

142.    In order to induce Plaintiffs to become and remain a Zeiss distributor, Defendants made the representations and commitments to Plaintiffs described above and induced Plaintiffs by its statements and conduct to become and remain a Zeiss distributor and to expend significant

amounts of time, effort, and money to develop and cultivate customers and goodwill for Zeiss equipment and products, as well as the services associated with the Zeiss equipment and product lines. Such representations and commitments include promises to Plaintiffs that Plaintiffs could remain as a long-term dealer of Zeiss equipment and products.

143. Plaintiffs reasonably relied upon the statements and conduct of Zeiss in becoming and remaining a dealer/distributor of Zeiss equipment and products, and in expending substantial time, effort and money to develop and cultivate customers and goodwill for Zeiss and its products.

144. Plaintiffs have suffered substantial harm as a result of Defendants' breach of these obligations and are estopped to deny, in that Plaintiffs have invested substantial amounts of money, time, effort and skill in developing and maintaining a market for Zeiss equipment and in creating and preserving goodwill toward the Zeiss product and equipment names in Plaintiffs' territory. Defendants are further estopped to deny that Plaintiffs will be deprived of the benefit of its efforts because of Defendants' termination, all to Plaintiffs' damage in amounts that cannot now be exactly determined, but will be fully demonstrated at a trial on the merits of the case, and which are reasonably estimated to exceed $75,000.

## COUNT IX
## UNJUST ENRICHMENT

Plaintiffs reallege and incorporate by reference all the allegations set forth in the preceding paragraphs as though fully set forth herein.

145. The conduct by Defendants in encouraging and allowing Plaintiffs (1) to serve as a distributor of Zeiss equipment, (2) to build up the business of selling and servicing Zeiss equipment, and (3) to make substantial investments of time and money at the behest of Defendants and in reliance on continuing as an Zeiss distributor; and then breaching the

Agreement and obligations with Plaintiffs and the reasonable expectations of Plaintiffs by taking the territory that Plaintiffs had built over many months of effort and investment, and then terminating Plaintiffs' Distributor Agreement, constitutes unjust enrichment.

146.    Such unjust enrichment for Defendants is also specifically provided for in the Distribution Agreement between the parties. Two years and three months, the length of the Agreement, is specifically stated to be sufficient time to enable MAC Surgical to realize a satisfactory return on any investment it has made or may make. See DA/Exhibit 1 § 13.01. Terminating MAC Surgical before the contract was even halfway completed shows that Defendants were unjustly enriched.

147.    The amount by which Defendants have been, or will be, unjustly enriched, and

148.    the amount Plaintiffs are, or will be, entitled to recover cannot now be exactly determined, but will be fully demonstrated at a trial on the merits, and is reasonably estimated to exceed $75,000.

## COUNT X
## TORTIOUS INTERFERENCE

Plaintiffs reallege and incorporate by reference all the allegations set forth in the preceding paragraphs as though fully set forth herein.

149.    Plaintiffs had existing contracts and prospective economic opportunities of which Defendants were aware, including, but not limited to existing and prospective customer relationships, and non-competition agreements with MAC Surgical employees.

150.    Defendants engaged in wrongful conduct toward Plaintiffs, as described above, specifically, but not limited to, terminating Plaintiffs without cause, informing Plaintiffs' employees before termination that such termination would occur, and immediately employing MAC Surgical's employees.

151.    Defendants' intentional actions are without legal justification, and Defendants have improperly interfered with Plaintiffs' current and prospective business relationships of which Defendants had knowledge.

152.    Defendants' actions demonstrate a deliberate disregard for the rights of Plaintiffs, entitling Plaintiffs to punitive damages in an amount sufficient to punish Defendants for their improper conduct and to deter Defendants and others from such conduct in the future.

153.    As a direct and proximate result of Defendants' tortious conduct, Plaintiffs have suffered damages in an amount yet to be determined, but that will be demonstrated at a trial on the merits of the case, and which are reasonably estimated to exceed $75,000.

## COUNT XI
## RECOUPMENT

Plaintiffs reallege and incorporate by reference all the allegations set forth in the preceding paragraphs as though fully set forth herein.

154.    The actions by Defendants described above terminated Plaintiffs' distributorship without good cause.

155.    Plaintiffs have made substantial investments in its distributorship, including capital expenditures and expenditures made in order to create a market for Zeiss equipment and products, in reliance on the continuation of its distributorship of Zeiss equipment and products.

156.    Plaintiffs did not receive from Defendant a reasonable period of time in which to recoup its substantial investments made to become and remain a Zeiss distributor prior to the termination of the agreements between the parties.   This is further evidenced in Distribution Agreement, section 13.01, which states that two years and three months is the time sufficient for recoupment of Plaintiffs' investment.

157.    As a result of the foregoing, Plaintiffs have suffered and will continue to suffer

damages in an amount that has not yet been determined, but will be fully demonstrated at a trial on the merits, and which are reasonably estimated to exceed $75,000.

## DEMAND FOR JURY TRIAL

158.    Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.    Award Plaintiffs their full amount of compensatory damages as established by a trial on the merits of this dispute;

2.    Award Plaintiffs their full amount of punitive damages as established by a trial on the merits of this dispute;

3.    A judgment requiring Defendants to pay Plaintiffs' complete costs, including disbursements, prejudgment and post-judgment interest, as well as Plaintiffs' reasonable attorneys' fees incurred herein, to the extent authorized under applicable law, or in the alternative, a judgment requiring Defendants to pay Plaintiffs' damages as appropriate under applicable statutory and common law;

4.    Such other and further relief as the Court may deem just and appropriate.

DATED: _February 3_, 2004

WORKER, SITKO & HOFFMAN LLC

By: _____

44

Gary W. Leydig, of Counsel (Illinois # 3128377)
150 N. Wacker Drive, Suite 3100
Chicago, Illinois 60606

(312) 345-1718


DADY & GARNER, P.A.


By: _Erika N. Donner_____
Ronald K. Gardner (Minnesota #027155X)
Erika N. Donner (Minnesota #0326872)
4000 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

(612) 359-9000

ATTORNEYS FOR PLAINTIFFS



## DISTRIBUTION AGREEMENT

**THIS AGREEMENT** made as of this 1st day of June, 2002 ("Effective Date"), between Carl Zeiss Surgical, Inc., a corporation having its principal place of business at One Zeiss Drive, Thornwood, New York 10594 ("Zeiss") and MAC Surgical, Inc., a corporation having its principal place of business at 811 N. Harlem, Suite 2N, Oak Park, Illinois 60302 ("Distributor").

### WITNESSETH:

**WHEREAS**, Zeiss is engaged in the business of manufacturing, marketing and selling medical operating microscopes and related accessories and other medical products; and

**WHEREAS**, Distributor is engaged in the business of marketing and selling medical operating microscopes and related accessories and other medical products; and

**WHEREAS**, Zeiss desires to engage Distributor to act as its independent sales representative to market and sell certain medical operating microscopes and related accessories upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### 1. PURPOSE.

Distributor will act as Zeiss' non-exclusive, independent sales representative for the Products in the Territory as described below.

### 2. PRODUCTS.

**2.01 Zeiss Products.**
This Agreement relates to (i) Zeiss operating microscopes and related accessories and other medical products of Zeiss; and (ii) operating microscopes and related accessories and other medical products manufactured by others and distributed in the Territory by Zeiss, (referred to collectively hereafter as the "Products"), as defined in **Schedule A**. Zeiss may amend **Schedule A** to include new microscopes and accessories and other medical products or to delete microscopes and accessories and other medical products at any time and upon notice to Distributor.

**2.02 Third Party Products.**

**(a) Limitation.**
The Products shall represent the Distributor's main revenue source. However, Distributor is encouraged to supplement the Products with non-competing third party products that are



**EXHIBIT**

1



**DISTRIBUTION AGREEMENT**                                    PAGE 2 of 13

complementary to the Products. Such third party product sales may represent a maximum of forty percent (40%) of Distributor's gross revenues. Zeiss shall assist Distributor in identifying acceptable third party products and shall, from time to time, negotiate procurement terms for such third party products.

   **(b)    Amendment of Products.**
It is Zeiss' intention to negotiate with other manufacturers for national distribution of those companies' products through the Zeiss distribution organization, and to thereby amend **Schedule A** accordingly. At the time of any amendment, if Distributor is promoting or selling products which are competitive with the products added by Zeiss to **Schedule A** in accordance with this paragraph, Distributor shall cease the promotion and sale of such competitive products upon the earlier to occur of the expiration of sixty (60) days from Zeiss' mailing of such amended **Schedule A** or the exhaustion of Distributor's existing inventories of such competitive products. If Distributor is unwilling or unable to do so, or shall fail to desist from promoting or selling such competitive products, Zeiss may, upon notice to Distributor, terminate this Agreement with immediate effect.

## 3.    TERRITORY.

**3.01.    Territory Defined.**
Distributor's territory shall be defined in **Schedule B** (the "Territory"). Zeiss may, at any time, change the Territory upon notice to Distributor. In such event, due consideration will be given in the form of compensation for business opportunities for which the Distributor had been responsible and which business will result in placement of a customer order with Zeiss in a reasonable period of time, to be negotiated at the time of such Territory change.

**3.02.    Zeiss Sales in the Territory.**
Distributor understands that Zeiss may sell the Products directly to end users within the Territory and may sell the Products to dealers, distributors, and other vendors, for resale to end users within the Territory. In such event, Distributor shall be entitled to a reasonable commission, as determined by Zeiss.

**3.03.    Restricted Sales.**
Distributor shall not market and sell the Products to any person, firm or entity which Distributor knows, or has reason to know, will (i) resell the Products either within or outside of the Territory; or (ii) use the Products outside of the Territory, without prior written approval from an officer of Zeiss. The area in which the Products are used shall determine whether the sale occurred within or outside of the Territory. Distributor shall promptly notify Zeiss of all inquiries received by it originating, or for end use, outside of the Territory and shall provide Zeiss with any information received with respect to such inquiry.

**3.04    Office Products Market Limitation.**
Distributor acknowledges that Zeiss maintains alternative channels of distribution for the Office Products Market, as further defined in **Schedule I**. Distributor will not sell Products in the Office Products Market but will refer all leads for Products within the Office Products Market to Zeiss in a timely manner. Zeiss may amend **Schedule I** from time to time, upon notice to the Distributor.



## 4.    DISTRIBUTOR'S DUTIES.

### 4.01.    Best Efforts.
Distributor shall use its best efforts to market and sell the products throughout the Territory and shall devote such time and efforts with respect thereto as may be reasonable required.  In order to adequately perform its responsibilities under this Agreement, Zeiss requires that Distributor and Distributor's principal officers shall not be active participants in other business ventures.

### 4.02    Sales and Marketing Efforts.
In order to promote its sale efforts, Distributor shall, from time to time, visit customers and potential customers and, upon request by a customer or Zeiss, demonstrate and test the Products and otherwise respond to customer's and potential customer's needs.  Notwithstanding the foregoing, Zeiss shall have the right to visit customers and potential customers within the territory.

### 4.03    Trade Show Representation.
Distributor will provide representatives to assist Zeiss in trade shows.  Zeiss will reimburse Distributor for travel expenses incurred by Distributor's participation in such trade shows.  Reimbursement shall be in accordance with the terms of the Co-operative Bonus Points Program as set forth in **Schedule H**.

### 4.04    Sales Inventory Stocking Requirements.
Distributor shall maintain sufficient stock, as determined by Zeiss, of the items identified in **Schedule C** annexed hereto in order to satisfy the reasonable requirements of customers of certain Zeiss products.  Zeiss, in its sole discretion, may modify **Schedule C** from time to time to include additional items.

### 4.05.    Installation and In-Service.
Distributor shall (i) with Zeiss' prior approval, assemble and install the Products sold by it to its customers; (ii) provide its customers with in-service training with respect to the use of the Products; and (iii) upon request of Zeiss, assist Zeiss' personnel.

### 4.06.    Failure to Provide Services.
If Distributor fails to perform its obligations under paragraph 4.05 to Zeiss' reasonable satisfaction, then Zeiss, upon notice to Distributor, may (i) to perform such services for the account of Distributor and be reimbursed, upon demand, by Distributor for Zeiss' reasonable costs incurred in so doing, or (ii) to consider Distributor in breach of its duties hereunder and terminate this Agreement with immediate effect.

### 4.07    Staff Qualifications.
Distributor shall maintain a staff of qualified sales personnel sufficient in number to fulfill its obligations hereunder and to meet market demand within the Territory.  The parties anticipate that such representation shall be defined as no less than one sales representative per eleven-thousand (11,000) medical-surgical hospital beds (currently calculated at $100 of sales potential per bed) or per one million one hundred-thousand dollars ($1.1 million) of potential Product revenue.  The parties recognize that the Products are sophisticated equipment used in various procedures, including surgical and neurosurgical procedures, and that improper installation and in-service training could result in serious injury to life or property.  In order to eliminate, to the fullest extent possible, the risk of injury and potential liability of Distributor and Zeiss, the Distributor shall (i) sell the Products exclusively to



**DISTRIBUTION AGREEMENT**                                                      PAGE 4 of 13

end-users; (ii) use only its own regular, full-time and properly trained employees to provide sales, installation and in-service training. Contracted agents (e.g., IRS "1099" basis), are not permitted without the prior written consent of Zeiss. Distributor shall evaluate its employees to determine the level of training required from time to time.

All Distributor sales personnel must receive training by Zeiss within no more than three (3) months of beginning to sell the Products and shall attend such other advanced Zeiss training as it is offered.

**4.08    Conformance with Law; Standards; Business Ethics.**
Distributor shall perform all of its obligations hereunder in accordance with all applicable laws, rules and regulations. Distributor shall observe standard procedures and policies of Zeiss with respect to its sales representatives, dealers and distributors, as such procedures and policies may be promulgated from time to time. Distributor shall perform all of its obligations hereunder in accordance with the highest standards of business ethics.

**4.09.    Reporting.**
Distributor shall, from time to time, report to Zeiss with respect to (i) the marketing and sales efforts of Distributor within the Territory; (ii) market conditions within the Territory; (iii) Customer Relationship Management ("CRM") data to include, without limitation, hospitals and ambulatory surgery centers, key contacts, installed base of Zeiss and competitors' Products, and business opportunities for Zeiss; and (iv) Distributor's financial information, which shall include used equipment sales. Distributor shall, on or before March 31 of each year, submit to Zeiss a report setting forth projected sales of the Products (which shall itemize the specific items projected to be sold) within the Territory for the following fiscal year. Distributor shall use its best efforts in projecting such sales and hereby acknowledges its understanding that Zeiss will rely on such projected sales in planning its business affairs.

**4.10.    Sales Restrictions.**
During the term of this Agreement, Distributor (or any principal of Distributor or any affiliate of Distributor or any entity in which any principal of Distributor holds any interest whatsoever) shall not market and sell within or outside of the Territory any products or related accessories of another person or entity competitive with the Products or, the products of any Zeiss subsidiary or affiliate, including without limitation Carl Zeiss Ophthalmic Systems, Inc., without the prior written consent of Zeiss, which consent may be withheld by Zeiss if Zeiss determines, in its sole discretion, that Zeiss is currently, or may in the future, distribute products similar to, or in competition with such products.

**4.11.    Ownership and Management Changes.**
Distributor shall promptly notify Zeiss in writing of all changes of its ownership and management.

**4.12    Demonstration Stock ("Stock On Memo") Policy.**
Zeiss will, from time to time, at its sole cost and expense, deliver to Distributor certain equipment (the "Demonstration Stock") to be used to demonstrate the Products to customers. Distributor may request from Zeiss additional Demonstration Stock which may be delivered by Zeiss, in its sole discretion, to Distributor. Zeiss' Regional Sales Manager shall administer all deliveries of and requests for the Demonstration stock. The Demonstration Stock shall remain the property of Zeiss. Distributor shall (i) take all reasonable precautions to safeguard the Demonstration stock; (ii) use its best efforts to ensure that no person operates the Demonstration Stock who is not fully trained to do so in accordance



**DISTRIBUTION AGREEMENT**                                                        **PAGE 5 of 13**

with Zeiss standards; (iii) take, at its sole cost and expense, all preventive maintenance measures prescribed by Zeiss; and (iv) notify Zeiss promptly in the event of any loss or malfunction of or damage to the Demonstration Stock. Distributor shall pay the cost to repair or replace the Demonstration Stock if it is lost or damaged (ordinary wear and tear excepted), and shall carry appropriate insurance against all risks of loss. If the Demonstration Stock is lost or damaged and the insurance required by the preceding sentence does not cover such loss or damage, then the parties shall use their best efforts to allocate the cost of such loss or damage between the parties.

Distributor shall sell Demonstration Stock within sixty (60) to one-hundred-twenty (120) days. If Distributor retains Demonstration Stock for more than one-hundred-twenty (120) days, it shall be assessed a carrying charge equal to ten percent (10%) per annum of the value of such Demonstration Stock, prorated monthly, which amount will be deducted from Distributor's monthly commissions.

**4.13    Minimum Sales Requirement.**
The Distributor will be required to achieve a minimum Product sales requirement ("Minimum Sales Requirement" or "MSR") for a twelve-month period beginning on the Effective Date. The MSR is set forth in **Schedule D**. Thereafter, Zeiss and Distributor shall review the MSR on a quarterly basis. Based upon the quarterly reviews, Zeiss may, at its sole discretion, adjust MSR.

If, during the term of this Agreement, Distributor fails to meet the MSR, Zeiss, may terminate this Agreement with immediate effect.

**4.14.    Warranty and Repair Service.**
Distributor shall not (i) perform, or permit any third party to perform, any warranty or repair service with respect to any products sold by Zeiss or manufactured by Carl Zeiss of Oberkochen, Germany, or (ii) operate any service or repair facility or provide any repair or service in competition with Zeiss' field or central service organization. Distributor shall notify all customers that they should contact Zeiss directly to obtain warranty and repair service. Upon receiving a request from a customer for warranty and repair service, Distributor shall promptly notify Zeiss of such request, identifying to Zeiss the name, address and phone number of the customer and the nature of the warranty or repair service. Upon receiving such notice, Zeiss shall cause for Zeiss service personnel or a third party selected by Zeiss to complete such warranty or repair service. In no event whatsoever shall Distributor perform or use any third party to perform such warranty or repair service. If the Distributor fails to perform its obligations under this paragraph, then Zeiss shall have the right, upon notice to Distributor, to consider Distributor in default of this Agreement and to terminate this Agreement with immediate effect.

**4.15    Used Equipment.**
Distributor may sell used Products, however, Distributor may not refurbish or otherwise alter the appearance or functionality of used Products prior to resale. Distributor must therefore represent such used Product sales as "as is". Furthermore, Distributor shall not represent that the Products have been refurbished or that Distributor is an authorized refurbisher. All sales of used Equipment are to be reported to Zeiss no later than thirty (30) days after installation. Distributor must provide, at a minimum the following information: model, price of instrument sold, customer name, customer address, primary customer contact person and telephone number. Distributor shall pay to Zeiss twelve and one-half percent (12.5%) of Distributor's gross revenues from the sale of such used Products.

 **DISTRIBUTION AGREEMENT**                                  **PAGE 6 of 13**

**4.16    Electronic Communications.**
Distributor shall maintain its computer and communication systems to assure compatibility with the current Zeiss applications in use.  Zeiss shall provide Distributor at least ninety (90) days' notice of any changes Zeiss intends to make to its systems.

**5.    ZEISS' DUTIES.**

**5.01.    Information.**
Zeiss shall keep Distributor informed of all pricing, delivery, technical and other information which Zeiss deems necessary for Distributor to perform its duties.

**5.02.    Advertisements and Promotional Materials.**
Zeiss shall provide Distributor with sales promotion and publicity materials and other literature and information reasonably required by Distributor with respect to the Products.  Zeiss may, from time to time, invite Distributor to participate with Zeiss in exhibitions, publicity campaigns and other advertising efforts, the cost of which shall be allocated between Zeiss and Distributor in accordance with the terms of the Co-operative Bonus Points Program (**Schedule H**).

**5.03    Training.**
Zeiss shall support Distributor in its sales efforts in the form of training personnel, technical advice and sales support.  It is anticipated that Zeiss will conduct formal sales and Product training no less than twice yearly, and Distributor and its sales personnel will be required to attend such training sessions.

**5.04    Installation.**
The Products are to be installed at the customer site only by Zeiss field service personnel, unless otherwise authorized in writing by Zeiss.

**5.05    Warranty and Field Service.**
Zeiss will perform all warranty and field service for the Products, pursuant to its warranty obligations or service obligations **on an exclusive basis**.

**6.    PURCHASE CONDITIONS.**

**6.01.    Price List.**
Zeiss shall provide Distributor from time to time with Zeiss' price list with respect to the Products.  Distributor shall use the list price when making price quotations to customers.  Distributor must receive prior written authorization from Zeiss if it intends to offer a discount greater than that allowable.

**6.02.    Purchase Order Terms and Conditions.**
All purchase orders shall be subject to (i) acceptance by Zeiss and (ii) the terms and conditions set forth on Zeiss' order confirmation, a copy of which is annexed hereto as **Schedule E** and made a part hereof (the "General Conditions").  Zeiss shall have the right to modify **Schedule E** from time to time to reflect the General Conditions currently in use by Zeiss.



**6.03. Sales Quotations.**
Distributor will issue all sales quotations exclusively by using Zeiss' proprietary quotation program.
Zeiss shall provide Distributor with copies of its order confirmation and shipping notification.

**6.04. Returns.**
Zeiss may accept such returns and make such allowances and adjustments with respect to the Products
as it shall determine, in which event the commission paid shall be adjusted accordingly. Returns must
be processed according to Zeiss' standard procedures.

## 7.    COMMISSIONS.

**7.01. Commission Structure.**
For the performance of Distributor's duties, Zeiss shall pay to the Distributor commissions in
accordance with **Schedule F** annexed hereto.

**7.02. Calculation of Commission.**
Commissions shall be calculated on the basis of "net invoice price" on all purchase orders for the
Products placed with Zeiss. The net invoice price shall equal the full invoice price less (i) all delivery
charges, taxes and customs charges, if applicable, and (ii) any discounts or rebates granted by Zeiss
and/ or Distributor.

**7.03. Return of Commission.**
Distributor shall refund to Zeiss, upon demand, all commissions (or any part thereof) paid to it where
Zeiss has accepted a return of the Products or has made an allowance or adjustment of the net invoice
price. If such refund is not made, Zeiss shall have the right to offset such refund against future
commissions earned by Distributor.

**7.04. Cancellation of Purchase Order.**
No commissions shall be due for purchase orders which are canceled prior to delivery.

**7.05. Payment of Commission.**
Commissions shall be earned by Distributor upon issuance of an order confirmation by Zeiss to the
customer and shall be paid to Distributor as follows: (i) fifty percent (50%) upon the issuance by Zeiss
to the customer of the confirmation of order ("Booking); and (ii) fifty percent (50%) upon the payment
by the customer of the full amount (or such partial amount as authorized by the customer) payable to
Zeiss as per Zeiss' invoice to the customer ("Payment")

**7.06 Incentive Commission.**
If Distributor achieves the MSR, it will be eligible for incentive commissions as set forth in Schedule
F. Further, if Distributor achieves the sales of specific numbers of individual products as set forth on
Schedule D ("Minimum Unit Sales"), it will be eligible for further incentive commissions under
Schedule F.

## 8.    NO AGENCY.

Zeiss and Distributor are independent contractors, and not employer-employee or principal-agent.
Neither party has the authority to assume any obligation or make any representation on behalf of the

 **DISTRIBUTION AGREEMENT**            **PAGE 8 of 13**

other, and neither shall hold itself out as having such authority.

## 9.     TRADEMARKS, PATENTS AND TRADE SECRETS.

### 9.01     Grant and Limitations.

Zeiss hereby grants to Distributor a royalty-free, non-exclusive right and license to use, only for so long as this Agreement is in force and for the sole purpose of performing Distributor's obligations under this Agreement, the trademarks and trade names (including designs, graphics, logos and other commercial symbols) under which the Products are sold (the "Trademarks"). Distributor shall not use the Zeiss name or logo in its stationery, business cards, literature, promotional materials or any other materials without the prior written approval of Zeiss. Distributor shall not take any action that may in any way infringe, impeach or lessen the validity of any of the patents or trademarks under which the Products are made or sold. Distributor shall not use the trademarks of Zeiss, Carl Zeiss of Oberkochen, or any of their affiliates, or anything resembling such patents or trademarks in any manner which Zeiss, in its sole discretion, considers misleading, detrimental or otherwise objectionable. Distributor may represent to its customers that it is an "Authorized Zeiss Distributor" in the sale of the Products.

### 9.02     Termination.

Distributor shall, immediately upon the termination of this Agreement, cease any and all such use of the Zeiss name or logo, and any and all such representation that it is authorized by Zeiss to sell the products.

### 9.03     Distributor Responsibilities.

Distributor shall report promptly to Zeiss any infringement of the patents or trademarks of Zeiss, Carl Zeiss of Oberkochen, or any of their affiliates which comes to the attention of Distributor. Distributor shall not take any action against any person, firm or entity making such infringement and its responsibility in the matter will cease when it has notified Zeiss. Distributor shall report promptly to Zeiss any suit, action or claim against Distributor or Zeiss alleging that the sale of the Products infringes any patent or trademark of another and Zeiss may, at its discretion, elect to assume control of and pay the expenses incident to any such litigation. Distributor shall cooperate with Zeiss in the defense of any such suit, action or claim.

### 9.04     Confidential Information.

(a)     Distributor shall keep confidential at all times during and after the term of this Agreement all confidential and proprietary information and trade secrets of Zeiss which Distributor shall obtain during the term of this Agreement. Distributor shall not divulge, use, publish or otherwise reveal such proprietary and confidential information and trade secrets, directly or indirectly, to any other person, firm or entity. Distributor shall take all reasonable steps to assure that such information is held confidential and safe and to assure that its officers and employees are bound by the provisions of hereof.

(b)     All reports, documents, drawings, layouts, sketches, samples, techniques, ideas, formulas and the like relating to the Products furnished by Zeiss to Distributor and the Demonstration Stock shall (i) be used by Distributor solely to promote the marketing and sales of the Products; (ii) remain the exclusive property of Zeiss; and (iii) be returned by Distributor to Zeiss upon request by Zeiss or upon the termination of this Agreement.

 **DISTRIBUTION AGREEMENT**                                           **PAGE 9 of 13**

## 10.    EXPENSES.

Distributor shall pay all of its own costs and expenses incurred with respect to the marketing and sales of the Products, unless otherwise provided in this Agreement.

## 11.    INSURANCE.

Distributor shall maintain during the term of this Agreement, at its expense, liability insurance in an amount reasonably acceptable to Zeiss with respect to Distributor's activities under this Agreement.

## 12.    INDEMNITY.

Zeiss and Distributor shall indemnify and hold each other harmless from and against any claims, liabilities, costs and expenses (including legal fees and disbursements) of the party seeking indemnity, arising out of the acts of the other party, providing that the party seeking indemnity shall timely notify the other party, and provided the party from whom indemnity is sought shall have control of any litigation, at its sole cost and expense, and provided, further, that no compromise thereof shall be entered into without the express written consent of the party from whom indemnity is sought.

## 13.    DURATION AND TERMINATION OF THIS AGREEMENT.

**13.01   Term of Agreement; Automatic Termination.**
Unless terminated earlier pursuant to this paragraph, this Agreement shall be valid from the Effective Date to and until September 30, 2004, at which time this Agreement will automatically terminate. It is contemplated by the parties that they will review their relationship during the months immediately preceding its automatic termination to determine whether and on what terms the relationship may be continued upon mutual agreement for successive terms of two (2) years from the original termination date, unless otherwise agreed by the parties. **Nothing in this Agreement will be construed to require either party to agree to any such extension, and Distributor expressly agrees that the duration of the Agreement as set forth above is sufficient to enable it to realize a satisfactory return on any investment it has made or may make in connection with the establishment and operation of its Distributorship.**

**13.02   Termination Upon Notice.**
This Agreement may be terminated without cause by either party at the end of any calendar month without cause on not less than sixty (60) days' notice to the other party. If such termination is initiated by Zeiss, Distributor shall be entitled to a phase-out, as per section 13.04 herein below. The effective date of termination shall be sixty (60) calendar days after the date of written notice and in accordance with Paragraph 14 of this Agreement.

**13.03   Immediate Termination.**
This Agreement may be terminated by either party with immediate effect upon the material breach of this Agreement by the other party if such breach is not cured within ten (10) days of notice thereof; or by Zeiss with immediate effect if: (i) Distributor fails to meet the Minimum Sales Requirements for the Agreement term as required by paragraph 4.13 hereof; (ii) Distributor sells products in violation of section 4.10 hereof and/or fails to cease distribution of products that become competitive with those manufactured or distributed by Zeiss or its subsidiaries or affiliates, after Zeiss notifies Distributor of

 **DISTRIBUTION AGREEMENT**                  **PAGE 10 of 13**

its intention to manufacture or distribute same (iii) Distributor violates the requirements of section 4.14 hereof; (iv) Distributor's financial position substantial deteriorates; (v) Distributor ceases to do business, terminates its existence, dissolves or liquidates; (vi) Distributor becomes insolvent or fails to pay its obligations (including its obligations to Zeiss) when they become due; (vii) a receiver is appointed to hold, manage or operate Distributor's property or business; (viii) there is a general assignment of Distributor's property or business for the benefit of its creditors; (ix) proceedings are instituted by or against Distributor under any bankruptcy or insolvency law; (x) Distributor changes ownership in any manner without Zeiss' express written approval of such change; or (xi) violates any other provision of this Agreement, including without limitation, section 4.15 regarding Used Equipment.

**13.04 Phase-Out**
If of termination initiated by Zeiss pursuant to section 13.02 of this Agreement, Distributor shall be entitled to a phase-out period of sixty (60) days from the date of written notice of termination. During the phase-out period, Distributor shall use its best efforts to conclude any open quotes it has previously issued, assist Zeiss as needed in rectifying outstanding customer accounts, and return any unsold demonstration inventory to Zeiss, at Zeiss' expense. At the end of the phase-out period, upon Zeiss' fulfillment of open quotes or orders, Distributor shall be entitled to a commission of fifty (50%) percent of the Distributor's standard commission for any quotations previously generated by Distributor, that result in orders within ninety (90) days of the end of the phase-out period. Zeiss shall have no duty to compensate Distributor for outstanding quotations that do not result in actual sales.

**14. NONCOMPETITION.**

Unless otherwise mutually agreed to in writing, for a period of one (1) year from the effective date of termination, or the expiration of this Agreement, Distributor shall not engage in the marketing or sale, nor enter the employ of or render any services to any person or entity which markets or sells products competitive with the Products within the Territory.

**15. ASSIGNMENT.**

Neither party may make any assignment of rights or transfer of obligations under this Agreement without the prior written consent of the other party, provided, however, that Zeiss may, without Distributor's consent, assign its rights and transfer its obligations to any Zeiss parent, subsidiary or affiliate organization.

**16. NOTICES.**

All notices, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been properly given if delivered personally or sent by registered or certified mail, return receipt requested, postage pre-paid, or by FedEx® or like courier service:

| If to Zeiss to: | If to Distributor to: |
|---|---|
| Carl Zeiss Surgical, Inc. | MAC Surgical, Inc. |
| One Zeiss Drive | 811 N. Harlem, Suite 2N |
| Thornwood, New York 10594 | Oak Park, Illinois 60302 |



| Attention: President | Attention: Michael Campagna |
|---|---|
|  | President |

or to such other addresses as the parties may designate by notice given in the manner specified in this Paragraph. All such notices, demands and communications shall be deemed effective on the date personally delivered, or five (5) days after deposited in the United States mails as registered or certified mail, or one (1) day after deposited with FedEx® or a like courier service.

## 17.    APPLICABLE LAW.

This Agreement shall be governed and construed under the laws of the State of New York and the venue for any action arising from this Agreement will be in White Plains, County of Westchester, State of New York.

## 18.    NO WAIVER.

If either party fails to exercise a right or insist on strict performance under this Agreement on one occasion, that party will not be precluded from exercising that right, or insisting on performance of that obligation on any other occasion; nor will this Agreement be modified in any way by such failure to exercise a right or insist on strict performance under this Agreement.

## 19.    VALIDITY.

If any term or provision of this Agreement or the application thereof to any person or circumstances becomes illegal, unenforceable, or void, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law, and the remaining provisions of this Agreement shall continue in full force and effect.

## 20.    ENTIRE AGREEMENT.

This Agreement represents the entire understanding of the parties with respect to the marketing, sales and service by Distributor of the Products. This Agreement may not be modified (except as otherwise provided) except by a writing signed by both parties.

## 21.    DISTRIBUTOR'S REPRESENTATIONS.

Distributor represents and warrants to Zeiss that: (i) Distributor is currently distributing the products of the persons and entities listed in **Schedule G** annexed hereto; (ii) the execution, delivery and performance of this Agreement and the transactions contemplated hereunder do not violate any agreement, instrument, order, judgement or decree to which Distributor is a party, or which Distributor is bound, or violates any other restrictions to which Distributor is subject; (iii) Distributor and the officer executing this Agreement, has the power and authority to execute, deliver, and perform this Agreement; and (iv) Distributor has taken all action required by law to authorize the execution and delivery of this Agreement and the confirmation of the transaction contemplated hereunder.



**DISTRIBUTION AGREEMENT**

## 22. DISPUTES.

### 22.01 General.
All conferences and discussions which occur in connection with the negotiations, mediation or arbitration conducted pursuant to this Section shall be deemed settlement discussions, and nothing said or disclosed, nor any document produced, which is not otherwise independently discoverable shall be offered or received as evidence, or used for impeachment or for any other purpose in any current or future arbitration or litigation.

### 22.02 Negotiation.
The parties shall attempt in good faith to resolve any controversy, claim or dispute arising out of or relating to this Agreement or the construction, interpretation, performance, breach, termination, enforceability or validity thereof, promptly by negotiation between executives who have authority to settle the Dispute and who are at a higher level of management than the persons who have direct responsibility for the administration of this Agreement.

### 22.03 Arbitration.
**A.** Any dispute, controversy or claim (whether such claim sounds in contract, tort or otherwise) arising out of or relating to this Agreement (or the breach, termination or validity thereof), or arising in any way out of the relationship of the parties shall, at the request of either party, be settled by arbitration in accordance with the Commercial Arbitration Rules of American Arbitration Association ("AAA") in effect at the time of the arbitration (the "Rules"), except as such Rules may be modified herein. If there is any inconsistency between the Rules and this Article, the provisions of this Article shall govern.

**B.** An award rendered in connection with an arbitration pursuant to this Article shall be final and binding on the parties and judgment upon such an award may be entered and enforced in any court of competent jurisdiction.

**C.** All proceedings under this Article shall be held in White Plains, New York.

**D.** The arbitrator shall determine the rights, remedies and obligations of the parties according to the law of the State of New York (excluding conflict of laws principles), and may not award punitive or exemplary damages to either party.

**E.** Each party shall be given not less than fifteen (15) days advance notice of the time and place of any arbitration hearing. The arbitration hearing shall be held not later than one hundred twenty (120) days after the appointment of the arbitrator and the arbitrator shall render his award not later than thirty (30) days after the closing of the arbitration hearing.

**F.** The final award (i) at the request of either party, shall set forth the grounds, factual and legal, upon which it is based; (ii) may allocate between the parties, in such proportion as the arbitrator deems proper, the costs of the proceeding, including the AAA administrative fee, arbitrator's compensation and the cost of stenographic transcripts and of expert witnesses, or may direct that all or part of such costs be borne directly by one party; (iii) may award to either party all or part of the legal costs, including reasonable attorneys' fees, incurred by such party because of the other party's unreasonable, frivolous, bad faith, or dilatory conduct in the course of the arbitration; (iv) may award the party which

 **DISTRIBUTION AGREEMENT**                                    **PAGE 13 of 13**

has prevailed, in whole or in balance on the merits, all or parts of such party's legal costs incurred in connection with the arbitration, including reasonable attorneys' fees.

**23.    CLAUSE HEADINGS.**

The headings and subheadings of clauses contained herein are used for convenience and ease of reference and shall not limit the scope or intent of the clause.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed on the Effective Date.

**CARL ZEISS SURGICAL, INC.**                    **MAC SURGICAL, INC.**

By: _____              By: _____
        (Signature)                                         (Signature)            05/16/02

Name: Mr. Eric Timko_____         Name: Michael Campagna_____

Title: President_____         Title: President_____



**DISTRIBUTION AGREEMENT**

**SCHEDULE A**

**PRODUCTS**

All the products listed in Zeiss' Surgical Products Division Master Price List ("MPL") as may be modified by Zeiss from time to time.



**DISTRIBUTION AGREEMENT**

**SCHEDULE D**

**MINIMUM SALES REQUIREMENTS**

MAC Surgical, Inc.          $6,000,000.00



### DISTRIBUTION AGREEMENT

### SCHEDULE E
### TERMS AND CONDITIONS



## DISTRIBUTION AGREEMENT

### SCHEDULE F
### COMMISSION

#### BASE COMMISSION:

Distributor's base commission is seventeen percent (17%), calculated on the full list price of the product or "ZMS" or package price if such prices exist. The base commission will be reduced at the rate of $.50 for each dollar of discount off the full list price.

All reductions in price (including demo, promotion, national account) will be treated as a discount for the purposes of the calculation. These reductions may be amended from time to time for special promotions at the discretion of Zeiss.

Commission payment will be made at 50% on Bookings and 50% on Shipment.

**The above is in effect for all Product lines except Office Product sold into hospitals (all Pico's)**, for which the commission structure is:

> 7.5% on order, 7.5% on payment. Distributor receives an additional 5% if Distributor installs the Product. The remaining 5% is payable upon receipt by Zeiss Service of completed installation report.

#### INCENTIVE COMMISSION:

There will be an incentive commission paid quarterly based on achieving 100% or more of your quarterly sales goal (full year quota/4). It will equal the Order amount in the quarter, multiplied by the factor for the appropriate quarter as noted below:

| 1st | 2nd | 3rd | 4th |
|------|------|------|------|
| .75% | .50% | .75% | .50% |

Upon achieving the Minimum Sales Requirement as per Section 4.13, Distributors will receive the following additional incentive commission payments, to be calculated on the basis of, and payable on, all net orders for the current fiscal year under the following structure:

| Minimum Order Requirement Achieved | Commission Incentive |
|------|------|
| = 100% < 105% | 0.33% |
| = 105% < 110% | 0.66% |
| = or    >110% | 1.0% |



### DISTRIBUTION AGREEMENT
### SCHEDULE H
### CO-OPERATIVE BONUS POINTS PROGRAM

Carl Zeiss, Inc. Surgical Products Division Distributors may participate in a Co-Operative ("CO-OP") Bonus Points Program which will be based on the following guidelines:

**How Earned:**

- During each year of this Agreement, the Distributor will accumulate CO-OP Program points at a rate of 0.1% of Distributor's annual net sales. Each CO-OP point is equal to one US dollar.

- All Products in Schedule A are qualified for the CO-OP program.

**How Reviewed:**

- The Sales Manager for the region in which the Distributor sells must approve all Distributor's requested CO-OP activity.

- Points will be reviewed and reported quarterly.

**How Used:**

- The CO-OP points must be used within the Carl Zeiss, Inc.'s business year (October 1 – September 30) in which earned, and for up to three months afterwards (i.e., through Q1 of the following fiscal year).

- All CO-OP points not used within the above timeframe will expire.

- The CO-OP points may be used as follows:

  ⇒ For advertising, local and state shows and exhibits, booth space, and other similar Zeiss-approved purposes.

  ⇒ For promotional materials (Carl Zeiss shirts, pens, caps, mouse pads, calendars or other Zeiss-qualified materials), which can be ordered through Carl Zeiss, Inc. or Zeiss-approved third party providers.

  ⇒ No more than 50% of total yearly CO-OP points can be used for hotel and travel to Zeiss authorized meetings and exhibits.

**How Reimbursed:**

- Carl Zeiss, Inc. will reimburse the Distributor within thirty (30) days of receipt of a copy of the invoice for the qualified CO-OP activity.

Mr. Bruce Proctor
Midwest Regional Manager
Carl Zeiss Inc.
One Zeiss Drive
Thornwood, NY 10594

June 1, 1999

Dear Mr. Proctor:

It has come to my attention that Zeiss is in need of representation in the Chicago area. Please allow me to give a brief overview of MAC Surgical and our unique circumstance in this market.

Since November 1994 thru the present, it has been my privilege to represent The Anspach Efforts outstanding line of surgical high-speed drills to the neurosurgical community in Illinois. The momentum of this unique and enviable position has afforded me the opportunity to expand the Anspach active account base from a mere three hospitals to thirty-two very active hospitals (see enclosed).

This account listing currently includes four of the largest and most renowned neurosurgical teaching facilities in the Midwest, Northwestern Memorial, University of Illinois, Evanston, and Cook County Hospitals. In each of these settings, long hard won acquaintance has evolved into a continuing consultative selling relationship where I am on a first name basis with many of the brightest in their field. This list will very soon include The University of Chicago Hospital as well as two other additional hospitals, awaiting the release of budget.

In this four and one-half year span I have been assisted on only one sales call and that was in 1995. Based on the overwhelming recommendation of several key surgeons, in November 1998, I formed MAC Surgical.

My challenge now as an independent distributor is to build a targeted, hard hitting portfolio of related neurosurgical products poised to take advantage of, and compliment, my existing account and relationship base. My current portfolio consists of Anspach, Boss Instruments and Kinamed Plating. The addition of Zeiss would create a powerhouse in this market. My plan is to showcase this portfolio in the same surgical suites where myself and my product lines are already very well known. My aim is to maintain this continuity of service and relationship building and to expand upon it. The near term addition of another motivated sales representative will make this goal achievable.



EXHIBIT
2

MAC Surgical may be small, but our reputation definitely is not.  Our mission, like that of the Marine Corps, with whom I served, is to achieve one thing...

### EXCELLENCE

- Excellence in how we serve and service our surgeons and their patients...
- Excellence in how we represent and champion our manufacturers and their products.

Many distributors get caught up in trying to be everything to everybody and lose sight of their original goal.

The goal of MAC Surgical is **not** to be the biggest.  Our goal is simply to be the best. I feel that MAC Surgical would be a valued addition to the Zeiss distribution network. I very much look forward to discussing how we might best start that process.

Sincerely,


Michael Campagna
President, MAC Surgical

# Employment Agreement

Agreement dated this _5_ day of _March_, 20 _01_, between Great Lakes Surgical, INC. (the "Employer"),
and _Michael Compagna_ (the "Independent Representative for GLS"),

1. **Employment.**  The Employer employs the Independent Rep. and the Independent Rep. accepts
employment upon the terms and conditions of this Agreement. This agreement will
also pertain to any and all employees employed by Independent Rep.

2. **Term.**  The term of this Agreement begins on the date set forth above and ends on the
earliest to occur of the following events:

   (1)  written notice of termination by Employer to Independent Rep. with or
   without cause;
   (2)  written notice of termination by Independent Rep. to Employer not less than
   14 days before the proposed date of termination;
   (3)  death of Independent Rep.

3. **Compensation.**  For all services rendered by Independent Rep., Employer shall pay Impendent
Rep. the following compensation, all of which is subject to withholding and other
applicable taxes paid by the Independent Rep.:

   (1)  a commission of 45 percent of Company Gross Profit generated from the sales
   made by Employee in his or her assigned territory set forth in paragraph 7,
   based on sales made during a calendar month, payable within 30 days from
   the end of that month; 50% of commission paid upon booking and 50% upon
   customer payment of equipment;
   (2)  Employee will be given 100% of all L.S.P. monies earned in Zeiss
   transactions;
   (3)  a commission of 10% of Company Gross Profit generated from equipment
   rentals made by independent Rep. in his or her assigned territory set forth in
   paragraph 7, based on rentals made during a calendar month, payable within
   30 days from the end of that month;

   As used herein, the term "Company Gross Profit" means the difference between retail sales price
versus the company's normal, standard cost for a one each purchase exclusive of any special quantity
purchase, payment or financing considerations, special promotions or freight and taxes or the gross
commission dollars earned by Employer for a given sale, as applicable.

   As used herein, the term "Company Net Profit" means Company Gross Profit less operating expenses,
costs, deductions, charges and liabilities incurred or deemed to be incurred by Employer according to
generally accepted accounting practices.

   If a customer fails to pay all or part of an invoice within 90 days from the date of the invoice, Employer
shall deduct the unpaid balance from calculation of the commission owed to the
Independent Rep. for the calendar month in which the invoice becomes delinquent. If the customer
subsequently makes a payment on the unpaid balance, Employer shall add the payment for purposes of
calculation of commission earned for the calendar month in which the payment is made.

EXHIBIT

3

Upon termination of this agreement as set forth in paragraph 2, Impendent Rep. shall be entitled to compensation which would otherwise be payable to Impendent Rep. up to the date of termination. Impendent Rep. shall be entitled to commissions earned to date of termination only, less any offsets and other deductions is not entitled to any compensation based on Employer's earnings subsequent to the date of termination.

4. <u>Duties</u>:    The Independent Rep. is engaged as a sales representative for Employer.    The precise services of Independent Rep. may be extended or curtailed by Employer from time to time.

5. <u>Extent of Services</u>.    The Independent Rep. shall devote 60% –70% of their time, attention , and energies to the Employer's business

6. <u>Representations of Independent Rep.</u>.    Independent Rep. represents and warrants to Employer that by accepting employment with Employer, Independent Rep. is not in violation of any agreement between Independent Rep. and any other party,  particularly any  covenant not to compete included  in any employment agreement with a previous employer. Independent Rep. agrees to hold Employer harmless from any and all claims, demands and causes of action  (including reasonable attorney's fees, expenses and court costs incurred by the defense of Employer) asserted against Employer by any third party because of the employment of Independent Rep. by Employer and because of the allegedly violation of any agreement  between Independent Rep. and the third party.

7. <u>Territory</u>.    Independent Rep. shall represent Employer in the area designated on the attached Exhibit A.

8. <u>Changes of Compensation, Territory and Employee Benefits</u>.    Employer may change the compensations and territory on written notice to Independent Rep. at least 30 days before the effective date of the proposed change. Independent Rep. acknowledges that Employer intends to decrease Independent Rep.'s commission percentage payable from Company Gross Profit described in paragraph 3(a) as Company Gross Profit increases, and such change is solely within Employer's discretion.

9. <u>Disclosure of information</u>.    The Independent Rep. acknowledges that the lists of the Employer's customers and prices and information relating to the Employers' products, processes, or services, including without limitation information relating to research, development, inventions, manufacture, purchasing, accounting , engineering, marketing, merchandising, or selling, as may exist from time to time, are valuable, special, and unique assets of the Employer's business. The Independent Rep. will not, during or after the term of his or her employment , disclose such lists or information or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever. In the event of a breach or threatened breach by the Independent Rep. of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Independent Rep. from disclosing in whole or in part, such lists or information,  or any part thereof, or from rendering any services to any person, firm, corporation, association , or other entity to whom any such list or information, in whole or in part, has been disclosed or is threatened to be disclosed. Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available to the Employer for such breach or threatened breach, including the recovery of damages from the Independent Rep..

10. <u>Restrictions</u>.    For a period of one (1) year after termination of employment, Independent Rep. shall not, individually or as a member, employee or agent of any partnership, joint venture or other form, or as any officer, agent, employee, director or stockholder of any corporation, or as an employee or agent of any person or firm, directly or indirectly, be connected in any manner with the selling, renting, providing, leasing, training, servicing, or repairing competitive medical equipment in the states of Illinois, Wisconsin, Michigan and Indiana. Independent Rep. acknowledges that this covenant is reasonable in time and scope.

11. <u>Violations and Remedies</u>. It is agreed between Independent Rep. and the Employer that a violation of any provision of the Agreement by Independent Rep. or Employer will constitute irreparable injury to the Employer, immediately authorizing Employer to obtain an injunction from a court of competent jurisdiction, enjoining Independent Rep. in any business enterprise with which Independent Rep. may be associated from further violations, in addition to all other rights and remedies to which the Employer may be entitled. In the event of violation of the Agreement by Independent Rep., and in addition to all other remedies, the Employer will be entitled to refuse to make the commission payments due under this Agreement.

12. <u>Attorneys Fees and Costs</u>. If any action in law or in equity is necessary to enforce this Agreement, the prevailing party shall be entitled to their reasonable attorneys fees, costs, and other disbursements reasonably incurred in such action in addition to all of the relief to which that party may be entitled.

13. <u>Partial Invalidity</u>. If any restriction contained in the Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, the restriction shall not be given effect to the extent of the invalidity or unenforceability found, but shall, nevertheless, be given effect to the fullest extent permitted by law.

14. <u>Notices</u>. Any notice required or desired to be given under this Agreement shall be deemed given if in writing sent by certified mail to his last known residence in the case of the Independent Rep., or to its principal office in the case of the Employer.

15. <u>Waiver of Breach</u>. The waiver by the Employer if a breach of any provision of this Agreement by the Independent Rep. shall not operate or be construed as a waiver of any subsequent breach by the Independent Rep.. No waiver shall be valid unless in writing and signed by an authorized officer of the Employer.

16. <u>Venue</u>. It is agreed between Employer and Independent Rep. that Lake County, Illinois is the county in which all obligations under this agreement are performable and the venue of any cause of action arising hereunder shall lie in Lake, County, Illinois.

17. <u>Parole Evidence Rule</u>. This instrument contains the entire agreement of the parties concerning the subject matter of this agreement and may not be contradicted by evidence of any prior agreement or any contemporaneous oral agreement. Neither party is relying on any representations except those representations which are specifically incorporated in this instrument.

18. <u>Applicable Law</u>. This agreement is governed by the laws of the State of Illinois.

19. <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties. It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

IN WITNESS WHEREOF the parties have executed this Agreement on _____, 19____

EMPLOYER:

GREAT LAKES SURGICAL, INC.

By:_____
President

INDEPENDENT REP.:

_____

# EXHIBIT "A"
# SALES TERRITORY

Consisting of the following zip codes: Illinois (604, 609, 612, 614, 615, 616, 617, 618, 619, southern half of zip code 606 and 607)

Suite 134 , 7115 W. North Ave ,Oak Park Il.6
Pagr 800-206-7112

# MAC SURGICAL INC.

August 7, 2001

Attention , Eric Timko
President of S.P.D. Division , Carl Zeiss ,

Eric,

Sincerest thanks for our discussion, Friday August the third, with yourself and Michael Sodini as to my reasons for discontinuing any association with Great Lakes Surgical and Mr. John Sonnenberg.

As stated, the situation was in an intolerable and rapid state of deterioration that ceased to serve the best interests of Zeiss , Anspach , and Mac Surgical , and in consultation with Mr. Tom Hartnett , Midwest Regional Manager for Anspach , and the full support of that organization , I elected to take the above action.

This decision was arrived at after much difficult deliberation, primarily due to the natural symbiotic "fit" between these two product lines and the immediate and substantial benefits resultant from an alliance. I am pleased that my immediate difficulties have not provided any obstacle to the continuation in other markets of this potent strategic positioning of the two manufacturers.

It is with extreme regret that I withdraw Mac Surgical from representation of Zeiss , and the abundant long term success that would surely have followed . I feel that a very real opportunity has been undermined and subverted. It is my steadfast determination that in my efforts to shield my own reputation from harm, that I exercise the same care and attention to the reputation of Zeiss. You may depend upon it as my personal guarantee.

As requested during the meeting ,please feel free to call upon , and count upon my best efforts in regards to both a smooth and professional transition , and any assistance that I might provide Mr. Sodini with damage control at Northwestern , Rush , Alexian Brothers ,or wherever he feels that it might prove beneficial .

I do not consider the relationship between Zeiss and Mac Surgical to be at an end , but merely entering a period of dormancy .Given other circumstances, I believe great things could be accomplished.

Enclosed please find documents that you may find pertinent.

Regretfully,

Michael Campagna
President, MAC SURGICAL INC.

*Striving for Excellence*



EXHIBIT

4

# MAC SURGICAL

### STRIVING FOR EXCELLENCE

Dear Dr. Franklin C. Wagner M.D

Sincere thanks for helping **MAC SURGICAL** to achieve, in 2001, **our greatest year ever**, as the Illinois (*and now , Northwest Indiana* ) Distributor for The **ANSPACH EFFORT** , and **KINAMED CRANIOFACIAL** !

Due, *in no small part*, to your own **very real** contribution in your use, and interest in our equipment, **MAC SURGICAL** is now the **Third Fastest Growing Distributor , and Third Ranked out of 38 Distributors Nationwide** , for The **ANSPACH EFFORT** , and the **#1 Distributor** Nationwide for **KINAMED CRANIOFACIAL** !!

We could **not** have done it without you, and you have our extreme appreciation and gratitude.

Due to the Great Success, and Rapid Expansion that your support is helping us to achieve, and in order to **increase** our **personal commitment** to the **Highest Level of Service and Support in the Industry**, **MAC SURGICAL** is pleased to announce our New Office at **811 North Harlem, Suite 2N, Oak Park Il, 60302** (see enclosed).

To that end, **Please do not consider any request too great or too small, as we await our next opportunity to be of assistance to your great work.**

Sincere Thanks,

Michael Campagna
President , MAC SURGICAL

Hope to see you at the AANS , and at our Cocktail Party (see enclosed), so that I can thank you personally !

**"PLEASE CALL UPON AND COUNT UPON OUR BEST EFFORTS ON YOUR BEHALF"**

MICHAEL CAMPAGNA  PRESIDENT  MAC SURGICAL
811 N. HARLEM SUITE 2N, OAK PARK, IL 60302

PAGER
FAX  70

EXHIBIT
5

MAC SURGICAL

811 N. Harlem Suite 2 N Oak Park, IL 60302    Fax 708-386-7801

## Mission Statement ...."Striving for Excellence"

**Excellence in the way we serve and service the Hospitals and Practices under our care. ...Excellence in the manner in which we conduct ourselves as we conduct business ...*Excellence in the way we achieve and perform for our manufacturers.***

**In this way, we leave a reputation for Excellence in our wake.**

## Accomplishments

***76% Growth for ANSPACH in 2001*, in Illinois , from a High Base , making *MAC SURGICAL* the *Third Fastest Growing Distributor in the ANSPACH Network*. Currently we are on track for the same level of growth in 2002.**

***Top KINAMED Distributor and Annual Sales Contest Winner for 2001 and 2002 .* This was achieved from a zero base in 2000.**

## Agenda

***It is our stated goal to become the #1 Anspach Distributor in 2003.***
**#1 in Sales. ...#1 in inventory management.... #1 in Growth...**
**#1 in Loyalty, Integrity, and Service.**
***This Goal Will Be Achieved!***

## Would your Organization Benefit from this same Committed Momentum?

## Territory

**The Top Two Thirds Of Illinois , and Northwest Indiana**


EXHIBIT
6

Eric Timko
President



November 13, 2002

| Carl Zeiss Surgical, Inc.
One Zeiss Drive
Thornwood NY 10594

914.681.7700

Fax 914.681.7418

etimko@zeiss.com

www.zeiss.com

Personal & Confidential.

Dear Michael,

Enclosed please find the Addendum to your Distribution Agreement. If you have any questions or concerns please call me directly. I would ask that you sign and return the original to me and keep a copy for your files. I wish you the best of luck in the upcoming year.

Warmest Regards,

Eric Timko

**EXHIBIT 7**



### ADDENUDUM TO DISTRIBUTION AGREEMENT

*This is an Addendum* to the Distribution Agreement ("Agreement") between Carl Zeiss Surgical, Inc., with offices at One Zeiss Drive, Thornwood, NY 10594 ("Zeiss") and MAC Surgical. with offices at 1142 Chicago Ave Suite 2N, Oak Park, IL 60302 ("Distributor").

### WITNESSETH:

**WHEREAS,** the parties desire to modify the terms of the Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    **Paragraph 4.12, entitled: Demonstration Stock ("Stock On Memo") Policy, will be amended so as to delete the second paragraph, which reads:**

Distributor shall sell Demonstration Stock within sixty (60) to one-hundred-twenty (120) days. If Distributor retains Demonstration Stock for more than one-hundred-twenty (120) days, it shall be assessed a carrying charge equal to ten percent (10%) per annum of the value of such Demonstration Stock, prorated monthly, which amount will be deducted from Distributor's monthly commissions.

**And to add in its place the following:**

   **"Keep it Fresh"**

   Distributor will have up to one-hundred-fifty (150) days after delivery in which to sell Demonstration Stock. If Distributor retains Demonstration Stock for more than 150 days, it will be charged 5% per annum of Distributor's average SOM balance over 150 days old.

   E.G.: Charges on Demonstration Stock days 0-150 = 0. Charges on Demonstration Stock days 151 ⇒ = (5% * balance) / 12.

   Said charge will be assessed monthly and deducted from Distributor's monthly commissions. The foregoing will be effective for all Demonstration Stock delivered on or after October 1, 2002.

2.    **Paragraph 4.15, entitled: Used Equipment, shall be deleted.**

3.    **The following paragraph will be added to Section 2**

   **2.03    Used Equipment.**
   Distributor may sell up to one percent (1%) of its new business volume from the preceding year in used Zeiss equipment, provided such sales are "as-is" ("As-Is Sales") Distributor may not refurbish or otherwise alter the appearance or functionality of used Zeiss equipment prior to resale. Furthermore, Distributor will not represent that the used equipment has been refurbished or that Distributor is an authorized refurbisher. All used Zeiss equipment sales must be reported to Zeiss within thirty (30) days of installation. Distributor must provide Zeiss the following information: model, price of instrument sold, customer name, customer address, primary

**ZEISS** AMENDMENT TO DISTRIBUTION AGREEMENT
Page 2 of 2

customer contact person and telephone number. Distributor will pay to Zeiss twelve and one-half percent (12.5%) of Distributor's gross revenues from the sale of such used Zeiss equipment.

Distributor must dispose of all other used Zeiss equipment through the Zeiss Certified program, under the procedures provided by Zeiss from time to time. Failure to adhere to this requirement may result in adverse action against Distributor, including termination.

4. **The following new paragraph will be added to Section 7 and will supercede any prior provisions regarding commission splitting:**

**7.07    Splitting Commission.**
**(a)    Outside Territory Sales.**
For orders which Distributor generates where the ultimate consumer is outside the Territory, Distributor will receive a fifty percent (50%) commission ("Split Commission"). In order to be eligible to receive the Split Commission, Distributor must be the primary conduit for concluding the sale, including generation of quote and receipt of purchase order. All Split Commissions will be reviewed and approved by the vice presidents of operations for the applicable territories involved.

**(b)    National Accounts.**
If Distributor complies with National Account Contract Guidelines as provided by Zeiss, Distributor's commission for national account sales will not be reduced for the Contract Administration fee. However, if Distributor offers discounts in excess of the defined National Account Contract discount levels, then Distributor's commission will be reduced by the normal discounting fees and by the applicable Contract Administration fee. This will apply only to discounting; other deviations from National Accounts contracts will not affect the Contract Administration fee but must be approved in writing by the Zeiss vice president of the Distributor's Territory.

**IN WITNESS WHEREOF**, the parties have shown their agreement to the foregoing by their signatures below.

**Carl Zeiss Surgical, Inc.**                          **MAC Surgical**

By: _____                       By: _____

Name: __Eric Timko_____                  Name: __Michael Campagna_____

Title: __President_____                       Title: __President_____

Date: _____                     Date: _____

MICHAEL CAMPAGNA 30
MAC SURGICAL
1142 CHICAGO AVE. SUITE 2N
OAK PARK, IL 60302

2–7080 / 2710
0980105067

1488

DATE 2-20-03

PAY TO THE
ORDER OF MICHELE WANISH

$ 1262 28

TWELVE HUNDRED SIXTY TWO 28/100 only

DOLLARS

citibank
CITIBANK, F.S.B.
69 WEST WASHINGTON STREET
CHICAGO, IL 60602

COMMISSION for MRADSCOPE
SALE

MEMO SOCIAL SECURITY # 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

⑆271 07080 1⑆098010 5067⑆ 1488 ⑈0000126228⑈

EXHIBIT
8

# CARL ZEISS
# SURGICAL



A Publication of Carl Zeiss Surgical, Inc.                              September 2002

## A MESSAGE FROM ERIC'S OFFICE

The summer is coming to a close and that means that our fiscal year is in the home stretch as well. I am pleased to report that the 2002 summer results for CZSI surpassed the results posted in the summer of 2001. Orders in May and July were $ 22 million, a $ 2 million dollar increase over last year and revenues were also $ 22 million which is a $ 4 million increase. Thanks to all who pushed the limits to make it happen!

By the time this is in print, the August results should be known. Based on the feedback from the field expectations are high for a great close to our year. In spite of the difficult conditions in the country and in the marketplace that resulted in a disappointing first quarter, we are now in a position to exceed last year's great



results in orders, revenue, and operating result. It is not a "gimme" and will require a great team effort to make it happen, but it is definitely within reach.

I ask that we all pull together and utilize whatever resources are needed and available to make it happen. We can then celebrate our success in October.

Thank you for your continued support to CZSI. We are proud to have the best sales and service team out there representing us in the marketplace. Best of luck to all for the close.

Warmest Regards,

Eric Timko

### IN THIS ISSUE:

From the President
Upcoming Events
OPMIC pro
Communication Styles
Video Update
OPMI Vario Neo
New Marketing Manager
Visualization Academy
In the Spotlight
MACI Surgical
Focus on the Field

### QUESTIONS OR COMMENTS

Do you have an interesting topic or a photograph you'd like to see featured in INK? Please send your ideas to Cheryl Stahl at cstahl@zeiss.com





ZEISS

### SEPTEMBER EVENTS

11-15 North Dakota Dental Association
Holiday Inn, Minot, ND

20-21 California State Association of Endodontists
Coronado Hotel, San Diego, CA

20-21 American Institute of Esthetic and Implant Dentistry Conference
Caribbean Ocean Hotel, Miami, FL

22-25 American Academy of Otolaryngology – Head & Neck Surgery Foundation
San Diego Convention Center, San Diego, CA – Booth 603
Zeiss Certified Booth #441

24-25 Congress of Neurological Surgeons
Pennsylvania Convention Center
Philadelphia, PA – Booth 1007
Zeiss Certified Booth #42

25-27 American Academy of Periodontology
Ernest N. Morial Convention Center
New Orleans, LA – Booth 801

27-29 California Dental Association
Hall Session
Moscone Convention Center, San Francisco, CA – Booth 1406

EXHIBIT 9

# CARL ZEISS SURGICAL 

## OPMI® PICO FOR SEXUAL ASSAULT MARKET

*By: Bill Leonard,*
*Office Products Distributor*

It is a disturbing commentary on our society that the market for instruments used in the documentation of sexual assaults in the USA is a growth industry.

Victims of sexual assault are typically taken to the Emergency Room or Emergency Department of the hospital closest to or within the jurisdiction of where the sexual assault occurred. Special individuals have been trained to handle these cases and are known as SART (Sexual Assault Response Team) or SANE (Sexual Assault Nurse Examiner). Typically, a dedicated room/area is used for the exam, but may also be performed in the Operating Room or emergency procedure area depending on the patient's condition upon arrival. Occasionally, if life-threatening injuries have occurred, the victim is examined in the OR while emergency surgery/life-saving intervention etc, is performed. Therefore, mobility and ease of set-up are major concerns, as exams need to be performed quickly due to patient anxiety and/or trauma they have recently sustained.

Forensic nursing involves evidence gathering for use in prosecuting the offenders. A colposcope is used to provide magnified views of lacerations, bite marks, micro tears, bruises, and other evidence difficult or impossible to view with the naked eye. It is critical that this evidence be clearly recorded and able to be introduced into a court of law. Documentation originally was exclusively 35mm photography but has now evolved into videotape, video printers, digital imaging or digital camera, and/or linking to a computer with retrieval and capture software.

Continued on page 3

### REASONS CARL ZEISS CAN COMPETE

Listed below are some main reasons that Carl Zeiss can successfully compete in this market and should have an opportunity to capture the largest market share of the SART/SANE market.

1. Optics: Unquestionably, the finest optics in the world, providing the sharpest detail with excellent illumination as well. Surprisingly, few nurses think of Zeiss for this market as they forget that we make colposcopes as well. The response of the nurses upon viewing an object such as an apple under the OPMI pico is unbelievable! As demonstrating and documenting small details is what forensic nursing is all about, the OPMI pico clearly emerges as a versatile instrument best suited for their needs with magnification from 2.8x - 17.7x (300mm objective).

2. Ease of Use: The overhead design is especially appreciated in forensic exams as the nurse can bring the optics quickly into position and accurately focus on the subject area. The suspension system is unlike anything the nurses have seen as this overhead design actually works without drift and can be locked if needed. Other overhead systems are available (such as Wallach) but they are nothing like the OPMI pico. If exams are necessary in the OR, only the OPMI pico can be easily introduced over the table. Also, the fully integrated video camera in the optics reduces overall weight and cables that can interfere with the exam.

3. Image Capture: With the addition of the MediLive ImageBox to the Zeiss product line, the final piece of the forensic puzzle has been found. A major consideration is hands-free operation so the foot pedal is a must. The ability to focus on the subject area, verify on screen, and capture the image by pressing the foot pedal is exactly what has been missing in this

market. Many programs want to capture the images, and burn a copy for their records. One copy goes to the detective, the other in the safe at the department. The read-only memory makes the ImageBox exceptional for the forensic market. MediLive ImageBox stores up to 43 images in memory (before archiving) and will retain them even if there is a power failure during the exam.

4. Fully Self-Contained System: With the flat screen monitor attached with the column bracket, and the MediLive ImageBox mounted on the base or with another bracket, the OPMI pico is a fully self-contained mobile forensic examination center that can go anywhere in the hospital as needed. While the size is a bit large for the average Ob/Gyn office, the OPMI pico is perfect for SART/SANE as it eliminates the need for the second cart with the accessories.

5. Price: Remarkably, the OPMI pico will often be less money than the other systems offered in this market. Cooper/Leisegang systems go up to $32,000 in this market and Cabot/ACMI have easily broken $20,000. With a list price of $12,700 for the OPMI pico colposcope, $4,998 for the MediLive ImageBox, $300 for the column bracket, and $895 for the Samsung monitor, the pico is competitively priced ($18,893). If Zeiss introduces a "forensic package OPMI pico" we might have a limited time promotion at the national IAFN as a launch into this market.

6. Service: Carl Zeiss is the only player in this market that can boast about a national service network and on-site as well. This may be a factor in the larger SART centers, such as MCV (Richmond, VA) that see 750 cases/year in just the pediatric alone!

# CARL ZEISS SURGICAL 

## OPMI® PICO

Continued from page 2

Recent products including Zeiss MediLive ImageBox and new generation Sony printers allow image capture and storage onto a CD.

The SART market was originally discovered as an entity worth pursuing as a whole by Cabot Medical (now Cabot/ACMI) in the early to mid 90's. In the past several years both CooperSurgical/Leisegang and Wallach Surgical have entered the market as viable alternatives to the Cabot colposcope which has remained fairly static in features and design. The Cabot/ACMI system features an accessory cart that contains the ancillary items such as video monitor, video printer, and VCR. Cooper/Leisegang and Wallach have attempted to appear "cutting-edge" with colposcopes linked to a computer with video capture capability and storage/retrieval software while offering a "forensic package" that has everything that the nurse examiner needs without the addition of a second cart.

There currently exists a "window of opportunity" for placing the Zeiss instrument line, specifically the OPMI pico with MediLive ImageBox and Samsung flat screen monitor on the column bracket, into the forensic market as the large SART hospitals have now figured out what they need after 4-5 years of first-hand experience and are looking for replacement systems. Smaller hospitals are looking for equipment for the first time or are looking to buy leading edge technology after functioning with very basic systems at the inception of their SART programs.

The upcoming IAFN (International Association of Forensic Nurses) national meeting in Minneapolis may be the ideal time for our entry.

## COMMUNICATING WITH DIFFERENT STYLES

One of the biggest challenges that we have in the corporate world is communication.

Whether we're a sales rep, customer service rep, marketing manager, and the like – inability to work with others can pose insurmountable difficulties.

It's important to remember that not everyone communicates the same way. Direct and to the point may not work for some, while "fluffy" talk before getting to the point may drive others crazy.

Years ago, researchers studied the art of communication. What they found was that communication and characteristic/personality styles affect the way we listen and speak.



*David Oravez*

Always, the responsibility lies on the speaker to understand his/her audience (the listener).

There are many different studies that have taken place over the last few decades. Whether it be the Myer's-Briggs style of characteristic identification or more simplistic styles that have evolved over the years – understanding the psychology of our co-workers makes the job of communicating with them that much easier.

Here are some general sample guidelines of characteristic styles – using the Amiable, Drive, Expressive, Analytical traits. Bear in mind, we all possess more than one style; however there is always the dominant trait that can be detected.

The Amiable is a real people person. This individual cares about YOU. He/she wants to know about you, get personal – then talk business. They are sensitive and good listeners. A smile on your face works wonders with this type. People who work well with the public often times are Amiables.

The Expressive is also a friendly, easygoing type. The difference with this trait, compared to the amiable, is that the expressive likes the light to be on them.

To communicate effectively with the expressive is to allow them time to speak about themselves, their job, their responsibilities, and successes.

The Driver is another story. The best CEO's and Managers possess a Driver characteristic style. These individuals want results. They want the facts and waste no time speaking about niceties when it comes to business. They like control but are often sensitive to the fact that they may not know everything. The Driver has a close-knit group in whom he/she trusts when it comes to making decisions. To earn that trust is to show commitment, intelligence and reason. Approach the individual with this style with direct, to the point statements but always show respect – as a co-worker, as a valued team player and for the experience/expertise they possess.

Finally there is the Analytic. This individual is one that is methodical and precise. To communicate effectively with this type of personality is to use facts, be precise. This individual likes to have details of a plan – both the long term and the short term if possible.

These are mere examples of what is called – Characteristics Identification. For more information – log onto TrainingNet.

# CARL ZEISS SURGICAL 

## VIDEO UPDATE

*By: Jeremy Diringer, Video Marketing Manager*

ediLive ImageBox orders continue to come in at a rapid pace. Why? Mark Wallen, sales representative for Paugh Surgical explains: "I have sold several and have some very pleased doctors! Dr. Sekhar in Neurosurgery is quite pleased with his. He thinks it is perfect for PowerPoint presentations! A retinal surgeon demo'ed it and insisted that the surgery center buy it for him.

This is one of those devices that makes sense for every order, and should be automatically included like you would a VCR. In many cases, I just put it on the order and it goes through without comment. It should be a part of every salesman quote just like video should be. As a salesman, you are missing the boat and leaving money on the table if you don't! I have sold at least 5 without evaluation, just on the concept!"

 

Another good reason… the promotions. Remember, the first person to sell 15 units by the end of September wins a 36" Sony XBR television and a Sony Digital Camcorder. The second person to bring in 15 units gets to choose either the TV or the Camcorder.

### SPECIAL FAREWELL

This will be Jeremy's last submission for INK as he has relocated to Ithaca, NY, where he will be attending Cornell University pursuing his Master's degree in business administration. We wish Jeremy great success and we hope to see him back at Zeiss!

## THE OPMI VARIO NC33 CONTINUES TO IMPRESS

*By: George Handley,*
*Neurosurgery Marketing Manager*

he OPMI Vario NC33 continues to impress orthopedic spine surgeons. We received several hot leads after a recent Spine workshop in St. Louis. Thanks to Dr. Dan Riew's (Barnes Jewish Hospital in St. Louis) recommendation, we have another orthopedic teaching facility as a Zeiss customer. After hearing what Dr. Riew had to say on the importance of a microscope and after spending several hours working with the system, the doctor was hooked. This is a great example of someone who has thought about using a microscope before but just never got around to using one.

It's not always this easy to sell a system but the opportunity does exist. Do a little poking around at your hospital. Who are the orthopedic spine surgeons that are doing anterior cervical cases? Are they using loupes or do they borrow the neurosurgeons microscope from time to time? Once you've targeted a potential customer drop off the NC33 brochure and the "we have your back covered" brochure. If you can follow up with a demo you are well on

your way to joining the club of Reps who have sold this system into the orthopedic spine market.

If your surgeon would like to visit Dr. Riew in surgery, we will gladly arrange to pay his way. As you look to increase sales in your territory

**Realize your vision** **focus**

don't overlook this growing market. Priced at $150,000 with video, this is the perfect system for Spine and will be a nice boost to your commission check.

As always, let me know if I can be of assistance. I'm happy to help you in the field if necessary.



# CARL ZEISS SURGICAL 

## ZEISS VISUALIZATION ACADEMY

*By: Eva Tille*

The Education Program has taken shape and everything is ready for all distributor representatives to get commitments for educational events from teaching institutions.

We are glad to announce that there is a separate site for the Zeiss Visualization Academy on MedNet where you are provided with all the marketing material you need to make the educational event a success.

- PowerPoint presentations for each disciplines that shall be used for the seminars
- A literature list indicating the literature packages that go with the various educational events
- Pictures of the giveaways
- The calendar of Educational Events.

You can look for teaching institutions in your sales area using the following links on the Internet:

U.S. Dental Schools
http://www.ada.org/prof/ed/programs/schools/us.asp

U.S. Dental Hygiene Schools
http://www.dentalsite.com/hygienists/hygsch.html

U.S. Medical Schools
http://www.aamc.org/members/listings/msgeoalca.htm

# NEW MARKETING MANAGERS

As of August 1st, we are pleased to announce that Angelique Destruel is the new Marketing Manager for Ophthalmology, and Elizabeth Garcia has taken over responsibility for the Drape and Loupe product lines.

This decision was based on the need to adopt a cross-functional approach in order to maximize our resources. Having such a strong pool of talent on our marketing team allows us to make such changes that will surely serve to benefit the company as a whole. Angelique brings extensive medical marketing experience, enthusiasm and dedication to ophthalmology, a discipline of critical strategic importance to our future. Likewise, Elizabeth brings a wealth of experience and enthusiasm to the drapes and loupes business; key areas of strategic focus this year for Zeiss worldwide. In addition, Elizabeth's new responsibilities

will allow her a more flexible work schedule. She is now in the office Mondays, Wednesdays and Fridays. She can be reached by cell phone for urgent matters at all times.


*Elizabeth Garcia and Angelique Destruel*

Please join us in congratulating both Angelique and Elizabeth on their new positions. We are confident that the result of this transition will greatly benefit the entire organization, and we appreciate your support.

# TECHNICAL SUPPORT TEAM WELCOMES INTERN

The Technical Support Services team welcomed intern Hendrick Hansen at the beginning of July where he quickly became an integral part of the department. Hendrick attends Friedrich-Schiller University in Jena, Germany where he will return in the fall to major in media and economic sciences. He wanted the opportunity to fine-tune his English skills and gain some US work experience.

During his internship, Hendrick spent his time working on digital photography and picture processing. The pictures will be

combined into a compendium of all surgical instruments (starting with the original OPMI 1) manufactured by Carl Zeiss. He's become a real expert and can take weak sketches and turn them into crisp and clear drawings. This certainly will aid in the identification process for all new employees. You will soon get a chance to see his handiwork with the release of the booklet scheduled for October.

It's hard to believe that summer is almost over and Hendrick will be returning to his native Germany in a few short weeks.


*Hendrick Hansen*

# CARL ZEISS SURGICAL 

## IN THE SPOTLIGHT

*By: Jim Riviello*

Last month's issue focused on Jim Heckett, one of our Buyer/Planners. This month's issue will focus on the second of our two Buyer/Planners, Gloria Vallo.

Gloria has been with the Carl Zeiss organization for twelve years, is married with three children and is known as the Pizza/Italian food impresario for a lot of our eating functions in Thornwood. Gloria is very proud of her son who, at seventeen, has just joined the National Guard. In her spare time she runs a side business known as "Mom's Taxi", chauffeuring around the rest of her brood from sporting events to school functions.

Gloria began her career at Carl Zeiss in *the customer service department of SPD*, moved to the position of SOM coordinator and then transferred to the Micro division. Upon returning to the SPD side of the house (after seeing the light), she rejoined SPD in an SOM capacity and then made her move into her present position as a Buyer/Planner.

Gloria is responsible for overseeing the purchasing requirements for the Ophthalmology product line as well as for all 3rd party (Domestic) products that



enhance the Zeiss product offerings. Gloria periodically meets with some of the manufacturers who produce these 3rd party lines to insure that we have a continuing source of product as required. She has also worked with our internal technical support group to help source possible manufactured items as needed. Gloria is also responsible for the purchasing activities for DENTAL/OBGYN Pico units and interfaces daily with her peers in Germany to make sure promises are kept and deliveries are being met in a timely fashion. Gloria also handles the purchasing requirements of our German office for their procurement needs of drapes and rotatable adapters, which are now part of



A job that needs vigilance, determination and a thorough understanding of all the requirements of the business.

the completed system shipment package. Developing and updating forecasted needs from CZO is critical for our overall on time delivery performance.

Last but not least, Gloria has taken over the purchasing responsibilities for Carl Zeiss Surgical's internal office material needs procured from Staples.

As part of her daily routine, Gloria will work with the customer service representatives to help them meet their customer demands. Gloria makes sure that the movement of accessory items is

handled in such a fashion that they meet up with the incoming system shipments from Germany. This activity is critical to insure customer satisfaction, installation compliance, as well as supporting the reputation of the name Carl Zeiss Surgical, Inc. The job of a Buyer/Planner usually doesn't get the credit or notoriety it deserves, and most times when it does get noticed it's for something that didn't happen as had been anticipated. It is a job that needs vigilance, determination and a thorough understanding of all the requirements of the business. Gloria and Jim both have the abilities and knowledge to get the job done and make our business environment an effective and efficient operation.

*Gloria Vallo*

So as I alluded to when I first wrote about this functional area, the Buyer/Planner has the ability to place smiles on the faces of our customers, the sales organizations and the customer service representatives. Both Gloria and Jim add to making our organization an area one can rely on to get the customers what they need while giving us all the structure necessary to achieve our financial goals. My thanks and respect to both for a job well done.

### SEPTEMBER BIRTHDAYS



# CARL ZEISS SURGICAL 

## MAC SURGICAL...
## STRIVING FOR EXCELLENCE

*By: Michael Campagna*

An open letter to our friends at Carl Zeiss Surgical from MAC Surgical.

The request came from Carl Zeiss that we put together a few words about MAC Surgical as a sort of "snapshot" into who and what we are, as the newest members of the Zeiss family. Not an easy task, considering the renown and reputations of the lion's share of our fellow distributors and the wealth of experience and accomplishments that they possess. In fact, it was quite a daunting task to consider when viewed against the pioneering history and achievements of Carl Zeiss itself, and its legacy of leadership and advancement in the field of microscopy.

Having been passed the Zeiss torch, a torch that can only be held high, or not at all, can be likened to that same feeling I had when I had first earned the right to wear the uniform of the United States Marine Corps, that other potent force to be reckoned with, to whom I have also borne allegiance.

The two organizations have much in common. Both are known for excellence, both wear their pride as a badge of honor. It is within neither organization to relinquish its lead, or make acquaintance with defeat.

It is no exaggeration to say that we at Mac Surgical are as proud to carry the Zeiss blue shield on our cards and letterheads, and the walls of our headquarters, as I was to carry the eagle, globe, and anchor on my chest. This torch will be held high. This shield will not falter.

I'd like to share with you the Mac Surgical mission statement, emblazoned on our office walls, laminated in every wallet, at the core of Mac Surgical since we founded in 1998:

"A commitment to excellence Excellence in the way we serve and service the hospitals and practices under our care Excellence in the manner in which we conduct ourselves as we conduct business Excellence in the way we achieve and perform for our manufacturers In this way, we leave a reputation for excellence in our wake"

I'd like to introduce the Mac Surgical team, who, to a man, (and to a woman for Kelly McFadden) embody these precepts.

From Todd Precour, Zeiss Salesman of the Year, to Tracy Gasior, the best man that Leica ever lost, from Jerry Summers, hardened veteran of Mac Surgical's battles, to Chris Danko, and Kelly McFadden, indispensable in those yet to come.

To be their Principal, with the Zeiss product line, is the rarest of privileges; a privilege that we will work hard to deserve.

Please feel free to call upon and count upon our best efforts on your behalf.

Sincere Thanks,

Michael Campagna
Distributor Principal - Mac Surgical

## FOCUS
## ON THE FIELD

*By: Ed Hollingsworth, Regional Service Manager.*

A native of Waterloo, Iowa, Tim Cooper is the Carl Zeiss Surgical, Inc. field service representative in the Chicago area and is responsible for servicing Zeiss surgical products in Illinois and Iowa.

Coop began his career in optics while in the US Navy. He was assigned to a submarine tender where he repaired periscopes and other optical equipment found on submarines and ships. During his Navy career he served in Diego Garcia in the Indian Ocean. His travels also took him to Israel and Spain.

Coop came to Zeiss in 1982 as a bench technician at the Zeiss facility in Manhattan. He worked there for

*Tim Cooper, "Coop"*

two years when he transitioned to field service in the New York metropolitan area. After three years he was able to transfer as a field service representative to Indianapolis, Indiana, then in 1989 he moved again. This time he relocated to Chicago where he remains today. A valuable member of the field service team, Coop is trained and qualified to service all Carl Zeiss Surgical, Inc. products excluding IGS products. We are proud of the ownership he demonstrates each day in his service area and with each of his customers and the special relationship he maintains with his counterparts in sales.

He and his wife Tina have been married for seven years. He has two stepsons and two grandchildren.

Off duty time is devoted to his family and spending time in his home recording studio. It has been said that Coop plays a "mean blues guitar".

CARL ZEISS INC., NEW YORK
SPD COMMISSION REPORT BY SALESMAN

FISCAL YEAR 02 PERIOD 12 SEPTEMBER

PAGE 9

DATE 10/10/02
TIME 9:57:11

SPD001R2

SALESMAN: 155 MAC SURGICAL

| LINE/SUB-LINE | ITEM NUMBER | ITEM DESCRIPTION | TRANS DATE | TRANSACTION DESCRIPTION | NET AMOUNT | COM % | COMMISSION PAID | ACCT UNIT | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|

AREA: 51 MAC - METRO CHICAGO - WISCONSIN    CITY: MILWAUKEE    STATE: WI

ORDER: 555-200376 DATE: 9/26/02 CUSTOMER: 284313 BAY CARE AURORA LLC    CUSTOMER PO#: 1X1284X25A

| 1 | 000000-1155-469-H00 CPM1 VARIO/608 HEIGHT ADJ.COL. | | 9/26/02 | BOOKING | 72,500.00 | 25.00 | 6,162.50 | 75553 | Neuro - Great Lakes Surgical |
| 1 | 000000-1097-465-000 2MS 910 STEREOOR. FACE TO FACE | | 9/27/02 | BOOKING | 15,400.00 | 25.00 | 1,309.00 | 75553 | Neuro - Great Lakes Surgical |
| | DIS | | 9/27/02 | BOOKING | 46,500.00 | 25.00 | 11,725.00 | 75553 | Neuro - Great Lakes Surgical |
| 4 | WARRANTY-PERIOD | | 9/27/02 | BOOKING | | | | CZ | Surgical Balance Sheet |
| 5 | SURGCONT | | 9/27/02 | BOOKING | 72,500.00 | 25.00 | 6,162.50 | CZ | Surgical Balance Sheet |
| 5 | 000000-1155-469-H00 CPM1 VARIO/608 HEIGHT ADJ.COL. | | 9/27/02 | INVOICE # 22035003 | 15,400.00 | 25.00 | 1,309.00 | 75553 | Neuro - Great Lakes |
| 4 | 000000-1097-465-000 2MS 910 STEREOOR. FACE TO FACE | | 9/27/02 | INVOICE # 22035003 | 46,500.00 | 25.00 | 11,725.00 | 75553 | Neuro - Great Lakes |
| | DIS | | 9/27/02 | INVOICE # 22035003 | .00 | | | CZ | Surgical Balance Sheet |
| | WARRANTY-PERIOD | | 9/27/02 | INVOICE # 22035003 | .00 | | | CZ | Surgical Balance Sheet |
| | SURGCONT | | 9/27/02 | INVOICE # 22035003 | .00 | | | | |

     ** TOTALS FOR ORDER:    BOOKINGS: 41,000.00    INVOICES: 41,000.00    COMMISSION DUE: 8,507.00-

ORDER: 555-200379 DATE: 9/27/02 CUSTOMER: 3611300 LUTHERAN HOSPITAL-LACROSSE    CUSTOMER PO#: M 113442    CITY: LA CROSSE    STATE: WI

| 1 | 304/053-0030-000-000 REPL. MODULE F SUPERLUX 300/301 | | 9/27/02 | BOOKING | 1,334.00 | 25.00 | 113.39 | 75553 | Neuro - Great Lakes Surgical |
| 1 | 304/053-0030-000-000 REPL. MODULE F SUPERLUX 300/301 | | 9/27/02 | INVOICE # 22039004 | 1,334.00 | 25.00 | 113.39 | 75553 | Neuro - Great Lakes Surgical |

     ** TOTALS FOR ORDER:    BOOKINGS: 1,334.00    INVOICES: 1,334.00    COMMISSION DUE: 226.78

ORDER: 555-200577 DATE: 8/27/02 CUSTOMER: 284311 AURORA MEDICAL GROUP    CUSTOMER PO#: 2286X30A    CITY: MILWAUKEE    STATE: WI

| 1 | 303601-9018-000-000 S LIGHT GUIDE 180CM (71") | | 9/06/02 | INVOICE # 22063305 | 405.00- | 25.00 | 34.43- | 75253 | Gen CPM1 New Sales Great Lakes |
| 2 | ANTIVCI | | 9/06/02 | INVOICE # 22063305 | 16.20 | 25.00 | 4.05 | 75253 | Gen CPM1 New Sales Great Lakes |
| 3 | RESTOCK | | 9/06/02 | INVOICE # 22063305 | 58.32 | 25.00 | 4.96 | 75253 | Gen CPM1 New Sales Great Lakes |

     ** TOTALS FOR ORDER:    BOOKINGS: .00    INVOICES: 330.48-    COMMISSION DUE: 25.42-

ORDER: 555-200581 DATE: 9/27/02 CUSTOMER: 3611300 LUTHERAN HOSPITAL-LACROSSE    CUSTOMER PO#: M 113442    CITY: LA CROSSE    STATE: WI

| 1 | 304/053-0030-000-000 REPL. MODULE F SUPERLUX 300/301 | | 9/27/02 | BOOKING | 1,334.00- | 25.00 | 113.39- | 75553 | Neuro - Great Lakes Surgical |

     ** TOTALS FOR ORDER:    BOOKINGS: 1,334.00-    INVOICES: .00    COMMISSION DUE: 113.39-

     ** TOTAL FOR AREA 51    34,792.50

AREA: 54 MAC - METRO CHICAGO - CASTOR    CITY: CHICAGO    STATE: IL

ORDER: 516-200930 DATE: 8/30/02 CUSTOMER: 6256300 SWEDISH COVENANT HOSPITAL    CUSTOMER PO#: 137255

| 1 | 326041-0000-000-000 DRAPE STER LASER ACC'S | | 9/03/02 | INVOICE # 22035822 | 84.00 | 25.00 | 7.14 | 71653 | Drapes Fld Sales Great Lakes S |

     ** TOTALS FOR ORDER:    BOOKINGS: .00    INVOICES: 84.00    COMMISSION DUE: 7.14

TRACY

EXHIBIT 10



**ZEISS**

# Carl Zeiss Surgical Incentive Report - Line Item Detail
## January 2003

Mac Surgical
Hospital Distributor
Salesperson ID 0155

| Order Header | Type | Invoice Number | Trans Date | Customer Name | Prod Line | Line Item | Ship ZIP | Item Number | Item Description | Qty | | Price | | Extended Price | | Comm Rate | | Base Commission |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 516-303988 | Invoice | 23012212 | 02/09/03 | Rockford Memorial Hospital | 116 | 0002 | 61103 | 3260500000000000 | Drape Star AirProcedAX Ray 8x20 | 1 | X | $177.00 | = | $177.00 | X | 8.9% | = | $15.65 |
| 516-303988 | Invoice | 23012212 | 02/09/03 | Rockford Memorial Hospital | 116 | 0001 | 61103 | NATACCT | National Account Discount-Dir | -1 | X | $17.70 | = | ($17.70) | X | 25.0% | = | ($4.43) |
| | | | | | | | | | Sales Subtotals | | | | | $159.30 | | 8.9% | = | $16.62 |
| 516-303982 | Booking | 23012668 | 01/30/03 | McKesson Medical-Surgical | 116 | 0004 | 60139 | NATACCT | National Account Discount-Dir | -2 | X | $9.00 | = | ($18.00) | X | 25.0% | = | ($4.50) |
| 516-303982 | Booking | 23012668 | 01/30/03 | McKesson Medical-Surgical | 116 | 0003 | 60139 | 3260713000000000 | Drape Star 48Min Ori Opmt Bx10 | 2 | X | $90.00 | = | $180.00 | X | 8.5% | = | $15.30 |
| 516-303982 | Booking | 23012668 | 01/30/03 | McKesson Medical-Surgical | 116 | 0002 | 60139 | 3260710000000000 | Drape Star 60Min Ori X-Lrg Bx5 | 2 | X | $80.00 | = | $160.00 | X | 8.5% | = | $13.60 |
| 516-303982 | Booking | 23012668 | 01/30/03 | McKesson Medical-Surgical | 116 | 0001 | 60139 | 3260710000000000 | Drape Star 48Min Ori Opmt Bx10 | 2 | X | $90.00 | = | $180.00 | X | 8.5% | = | $15.30 |
| | | | | | | | | | Orders Subtotals | | | | | $506.00 | | 8.7% | = | $20.40 |
| 516-303989 | Booking | 01/03/03 | 01/03/03 | Cigi Medical Center | 116 | 0001 | 60139 | 3260713000000000 | Drape Star 48Min Ori Opmt Bx 5 | 2 | X | $90.00 | = | $180.00 | X | 8.5% | = | $13.50 |
| 516-303989 | Booking | 01/03/03 | 01/03/03 | Cigi Medical Center | 116 | 0002 | 60139 | NATACCT | National Account Discount-Dir | -1 | X | $7.00 | = | ($7.00) | X | 25.0% | = | ($1.75) |
| | | | | | | | | | Orders Subtotals | | | | | $83.00 | | 8.7% | = | $4.20 |
| 516-303993 | Invoice | 01/01/03 | 01/01/03 | St.Alexius Medical Center | 152 | 0002 | 60194 | NATACCT | National Account Discount-Dir | -1 | X | $39.50 | = | ($39.50) | X | 25.0% | = | ($9.89) |
| 516-303993 | Invoice | 01/01/03 | 01/01/03 | St.Alexius Medical Center | 152 | 0001 | 60194 | 310000000000000 | Superlux 175 Lamp Module | 1 | X | $989.00 | = | $989.00 | X | 8.5% | = | $84.07 |
| | | | | | | | | | Sales Subtotals | | | | | $949.44 | | 7.8% | = | $74.18 |
| 552-300874 | Invoice | 23010537 | 01/14/03 | St.Alexius Medical Center | 552 | 0002 | 60194 | NATACCT | National Account Discount-Dir | -1 | X | $45.94 | = | ($45.94) | X | 25.0% | = | ($10.16) |
| 552-300874 | Invoice | 23010537 | 01/14/03 | St.Alexius Medical Center | 552 | 0001 | 60194 | 3034819020000000 | National Account Discount-Dir | 1 | X | $1,016.00 | = | $1,016.00 | X | 8.5% | = | $88.36 |
| | | | | | | | | | Sales Subtotals | | | | | $973.34 | | 7.8% | = | $76.20 |
| 552-300843 | Booking | 23010346 | 01/13/03 | St.Alexius Medical Center | 552 | 0002 | 60126 | NATACCT | National Account Discount-Dir | -1 | X | $40.64 | = | ($40.64) | X | 25.0% | = | ($10.16) |
| 552-300843 | Booking | 23010346 | 01/13/03 | St.Alexius Medical Center | 552 | 0001 | 60126 | 3034819030000000 | National Account Discount-Dir | 1 | X | $444.00 | = | $444.00 | X | 8.5% | = | $37.74 |
| | | | | | | | | | Orders Subtotals | | | | | $444.00 | | 8.5% | = | $37.74 |
| 552-300887 | Booking | 23011047 | 01/17/03 | Elmhurst Memorial Hospital | 152 | 0001 | 60921 | 3034819000000000 | S Light Guide 2200mm 60° | 1 | X | $680.00 | = | $680.00 | X | 8.5% | = | $58.80 |
| 552-300887 | Booking | 23011047 | 01/17/03 | Elmhurst Memorial Hospital | 152 | 0001 | 60921 | 3034819050000000 | S Light Guide 2200mm 80° | 1 | X | $26.64 | = | ($26.64) | X | 25.0% | = | ($6.66) |
| | | | | | | | | | Orders Subtotals | | | | | $680.00 | | 7.9% | = | $31.68 |
| 552-300888 | Invoice | 23011447 | 01/23/03 | Hinsdale Hospital | 152 | 0001 | 60921 | 3034819050000000 | S Light Guide 3000M (142°) | 1 | X | $444.00 | = | $444.00 | X | 8.5% | = | $37.74 |
| 552-300888 | Invoice | 23011447 | 01/23/03 | Hinsdale Hospital | 152 | 0001 | 60921 | NATACCT | National Account Discount-Dir | -1 | X | $26.64 | = | ($26.64) | X | 25.0% | = | ($6.66) |
| | | | | | | | | | Sales Subtotals | | | | | $444.00 | | 8.5% | = | $37.74 |
| 552-300852 | Invoice | 23011448 | 01/01/03 | Loyola Univ Medical Center | 152 | 0001 | 60153 | S Light Guide 1500Mm (80°) | S Light Guide 1500Mm (80°) | 1 | X | $880.00 | = | $880.00 | X | 8.5% | = | $74.80 |
| 552-300852 | Invoice | 23011448 | 01/01/03 | Loyola Univ Medical Center | 152 | 0001 | 60153 | S Light Guide 3500M (142°) | S Light Guide 3500M (142°) | 1 | X | $451.00 | = | $451.00 | X | 8.5% | = | $38.34 |
| | | | | | | | | | Sales Subtotals | | | | | $880.00 | | 8.5% | = | $74.80 |
| 555-300093 | Booking | | 01/07/03 | Mac Surgical, Inc. | 152 | 0002 | 60202 | 311010000000000 | Special Discount | -1 | X | $1,092.00 | = | ($1,092.00) | X | 25.0% | = | ($273.00) |
| 555-300093 | Booking | | 01/07/03 | Mac Surgical, Inc. | 152 | 0003 | 60202 | 3055400000000000 | Foldable Adapter For Binoc. | 4 | X | $0.00 | = | $0.00 | X | 8.5% | = | $0.00 |
| 555-300093 | Booking | | 01/07/03 | Mac Surgical, Inc. | 152 | 0004 | 60202 | 0000001906145000 | 12.5Magnified Flexion Eyepiece | 2 | X | $0.00 | = | $0.00 | X | 8.5% | = | $0.00 |
| 555-300093 | Booking | | 01/07/03 | Mac Surgical, Inc. | 152 | 0001 | 60202 | 0000001906145000 | 36Deg. Optical Wedge | 1 | X | $1,092.00 | = | $1,092.00 | X | 8.5% | = | $92.82 |

Report created by Synygy, Inc. 555 North Lane, Conshohocken PA, 19428 www.synygy.com (610) 664-7433 Copyright 2002. All rights reserved.

EXHIBIT 11

# Carl Zeiss Surgical Incentive Report - Line Item Detail
## January 2003

Mac Surgical
Hospital Distributor
Salesperson ID 0155

**Line Item Detail**

### 098 MAC - GRTR ILINN IN -SUMMERS

| Order Header | Type | Invoice Number | Trans Date | Customer Name | Prod Line | Line Item | Ship ZIP | Item Number | Item Description | Qty | Price | Extended Price | Comm Rate | Base Commission |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 555-300093 | Invoice | 23009531 | 01/05/03 | Lutheran Hosp Of Indiana Inc | 116 | 0001 | 46804 | 336071000000000 | Drape Star 65Mn Ovl Opm Bx 5 | | Orders SubTotals | | | ($160.18) |
| 555-300093 | Invoice | 23010043 | 01/06/03 | Mac Surgical, Inc. | 555 | 0001 | DIS | 311007000000000000 | Special Discount | -1 x $1,092.00 | = | ($1,092.00) | x 25.0% = | ($273.00) |
| 555-300093 | Invoice | 23010043 | 01/06/03 | Mac Surgical, Inc. | 152 | 0003 | 61437 | 30054300000000000 | Rotatable Adapter For Binoc. | 4 x $0.00 | = | $0.00 | x 8.5% = | $0.00 |
| 555-300093 | Invoice | 23010043 | 01/06/03 | Mac Surgical, Inc. | 152 | 0004 | 61437 | 12304Mefed000000000 | 12304Mefed Patrich Eyepiece | 4 x $0.00 | = | $0.00 | x 8.5% = | $0.00 |
| 555-300093 | Invoice | 23010043 | 01/06/03 | Mac Surgical, Inc. | 152 | 0002 | 61437 | 0000000100514500 | 300pg. Optical Wedge | 4 x $0.00 | = | $0.00 | x 8.5% = | $92.82 |
| | | | | | | | | | Sales SubTotals | | = | $0.00 | = | |
| 516-303029 | Booking | 23009719 | 01/06/03 | Proctor Community Hospital | 516 | 0002 | DIS | | National Account Discount | -1 x $21.00 | = | ($21.00) | x 6.7% = | ($3.23) |
| 516-303029 | Invoice | 23009719 | 01/06/03 | Proctor Community Hospital | 116 | 0001 | 61614 | 336071000000000 | Drape Star 65Mn Ovl Opm Bx 5 | 3 x $70.00 | = | $210.00 | x 8.5% = | $12.60 |
| | | | | | | | | | Sales SubTotals | | = | $189.00 | = | $12.50 |
| 516-303186 | Invoice | 23010121 | 01/09/03 | Ingalls Memorial Hospital | 116 | 0001 | 61614 | 336071000000000 | Drape Star 65Mn Ovl Opm Bx 5 | 3 x $70.00 | = | $189.00 | x 6.7% = | $12.60 |
| 516-303186 | Invoice | 23010121 | 01/09/03 | Ingalls Memorial Hospital | 516 | 0002 | DIS | NATACCT | National Account Discount-Dir | -2 x $21.00 | = | ($18.00) | x 25.0% = | ($4.50) |
| 516-303186 | Booking | 23010121 | 01/09/03 | Ingalls Memorial Hospital | 116 | 0001 | 61614 | 336071000000000 | Drape Star 65Mn Ovl Opm Bx 5 | 2 x $90.00 | = | $180.00 | x 8.5% = | $15.30 |
| | | | | | | | | | Orders SubTotals | | = | $162.00 | = | |
| 516-303227 | Invoice | 23010151 | 01/10/03 | Proctor Memorial Hospital | 116 | 0001 | 61637 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 2 x $90.00 | = | $180.00 | x 8.5% = | $15.30 |
| 516-303227 | Booking | 23010251 | 01/10/03 | Proctor Memorial Hospital | 116 | 0001 | 61637 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 2 x $90.00 | = | $180.00 | x 8.5% = | $15.30 |
| 516-303227 | Invoice | 23010251 | 01/10/03 | Proctor Memorial Hospital | 516 | 0002 | NATACCT | NATACCT | National Account Discount-Dir | -1 x $7.00 | = | ($7.00) | x 25.0% = | ($1.75) |
| | | | | | | | | | Orders SubTotals | | = | $63.00 | = | $4.20 |
| 516-303242 | Invoice | 23010319 | 01/15/03 | Lutheran Hosp Of Indiana Inc | 116 | 0001 | 46804 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | -1 x $7.00 | = | $7.00 | x 6.7% = | $4.20 |
| 516-303242 | Booking | 23010319 | 01/15/03 | Lutheran Hosp Of Indiana Inc | 116 | 0001 | 46804 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 1 x $90.00 | = | $90.00 | x 8.5% = | $7.65 |
| 516-303242 | Booking | 23010319 | 01/15/03 | Lutheran Hosp Of Indiana Inc | 116 | 0001 | 46804 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 1 x $90.00 | = | $90.00 | x 8.5% = | $7.65 |
| | | | | | | | | | Orders SubTotals | | = | $90.00 | = | $7.65 |
| 516-303403 | Booking | 23010879 | 01/17/03 | The Surgery Center | 116 | 0001 | 46804 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 4 x $70.00 | = | $280.00 | x 8.5% = | $23.80 |
| 516-303403 | Invoice | 23010879 | 01/17/03 | The Surgery Center | 116 | 0001 | 46804 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 4 x $70.00 | = | $280.00 | x 8.5% = | $23.80 |
| | | | | | | | | | Sales SubTotals | | = | $280.00 | = | $23.80 |
| 516-303582 | Invoice | 23011517 | 01/21/03 | Lutheran Hospital | 116 | 0001 | 46804 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 1 x $90.00 | = | $90.00 | x 8.5% = | $7.65 |
| 516-303586 | Booking | 23011517 | 01/21/03 | Lutheran Hospital | 116 | 0001 | 46804 | 326071000000000 | Drape Star 48Mn Ovl Opm Bx 5 | 1 x $90.00 | = | $90.00 | x 8.5% = | $7.65 |
| 516-303586 | Invoice | | | Lutheran Hospital | 116 | 0001 | | | Sales SubTotals | | = | $99.00 | = | $7.65 |
| 516-303620 | Booking | 23011344 | 01/22/03 | Proctor Community Hospital | 516 | 0002 | 61614 | NATACCT | National Account Discount-Dir | -1 x $90.00 | = | ($90.00) | x 25.0% = | ($22.25) |
| 516-303620 | Invoice | 23011344 | 01/22/03 | Proctor Community Hospital | 116 | 0001 | 61614 | 336071000000000 | Drape Star 65Mn Ovl X-Lng Bx 5 | 1 x $90.00 | = | $41.00 | x 6.7% = | $5.40 |
| 516-303620 | Invoice | 23011344 | 01/22/03 | Proctor Community Hospital | 116 | 0001 | 61614 | 336071000000000 | Drape Star 65Mn Ovl X-Lng Bx 5 | 1 x $90.00 | = | $90.00 | x 8.5% = | $7.65 |

# ZEISS

MAC Surgical
Hospital Distributor
SalespersonID 0155

## Carl Zeiss Surgical Incentive Report
### February 2003

### Co-op Points Earned this Month

| Monthly Orders | x | Dollar (%) | = | Points Earned this Month |
|---|---|---|---|---|
| $465,117.13 | x | 0.1% | = | 465.12 |

### Co-op Points Redeemed this Month

| Date | Reason | Approved By | Pts. Used |
|---|---|---|---|
| | | | |

Total Used this Month   0.00

### Current Co-op Point Balance

| Previous Balance | - | Redeemed this Month | + | Earned this Month | = | Current Co-op Point Balance |
|---|---|---|---|---|---|---|
| 768.42 | - | 0.00 | + | 778.79 | = | 1,564.21 |

### Administration Fee

| GPO Code | Net Sales (Exempt) | Net Sales x | Admin Fee Rate | = | Pay Rate | = | Admin Fee |
|---|---|---|---|---|---|---|---|
| 16 | $43,779.88 | $0.00 x | 10% | = | 50.0% | = | $0.00 |
| 17 | $1,072.50 | $0.00 x | 1.5% | = | 50.0% | = | $0.00 |
| 18 | $260.00 | $0.00 x | 1.0% | = | 50.0% | = | $0.00 |
| 19 | $75,538.60 | $181,825.98 x | 2.0% | = | 50.0% | = | $1,818.25 |
| 192 | $818.19 | $0.00 x | 2.0% | = | 50.0% | = | $0.00 |
| 21 | $220,315.47 | $0.00 x | 1.5% | = | 50.0% | = | $0.00 |
| 22 | $738.00 | $0.00 x | 1.0% | = | 50.0% | = | $0.00 |
| 23 | $7,010.06 | $0.00 x | 2.0% | = | 50.0% | = | $0.00 |

Subtotal for this Month $1,818.25
+ Subtract from Previous Months this Quarter $0.00
Quarter to Date Administration Fee = $1,818.25

### Installations

| Order Number | Net Order x | Comm. Rate | = | Installation Commission |
|---|---|---|---|---|
| | | | | |

Total Installation Commissions = $0.00

### Territory Commissions Summaries

| Territory | Order Commissions + | Sales Commissions + | Installation Commissions = | Total Commissions | Admin Fee - | SRPs = | Total Earnings |
|---|---|---|---|---|---|---|---|
| 051 - MAC - PRECOUR - WISCONSIN | $7,774.36 | $22,565.22 | $0.00 | $30,339.58 | $0.00 | $0.00 | $30,339.58 |
| 054 - MAC - METRO CHICAGO - OASOF | $5,194.40 | $7,891.46 | $0.00 | $13,085.86 | $0.00 | $0.00 | $13,085.86 |
| 055 - MAC - NORTHWEST IL - DANKO | $9,674.96 | $9,710.26 | $0.00 | $19,385.22 | $0.00 | $0.00 | $19,385.22 |
| 055 - MAC - GRTR ILNW IN -SUMMERS | $7,831.57 | $3,986.05 | $0.00 | $11,817.62 | $0.00 | $0.00 | $11,817.62 |

### Comments

ADMIN FEE ADJUSTMENTS: You have been debited $9,322.38 for Admin Fee Credit rec'd in 01/03. Your actual FY 2002 Q4 Admin Fee was $8322.38. This amount has been debited for proper payment.



EXHIBIT 12

# Carl Zeiss Surgical Incentive Report
## February 2003

MAC Surgical
Hospital Distributor
Salesperson ID 0155

**February Earnings**

**$55,791.52**

## Earnings Summary

| Net Order Commissions | + | Net Sales Commissions | + | Net Installation Commissions | + | Total Commissions | + | Administration Fees | + | SPIFs | + | Adjustments | + | Annual Bonus | = |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $30,475.29 | + | $43,960.99 | + | $0.00 | + | $74,436.28 | + | $0.00 | + | $0.00 | + | ($18,644.76) | + | $0.00 | = |

## Monthly Credits and Discounts, by Line Item Product Line

| Product Description | Product Line | Orders | Discount on Orders | Net Order Commissions | SPIFs | Sales Discounts on Sales | Net Sales Commissions | Net Orders | Net Sales |
|---|---|---|---|---|---|---|---|---|---|
| Video | 114 | 16,600.00 | 0.00 | 1,411.00 | 2,078.00 | 0.00 | 176.72 | 89,449.04 | 79,654.27 |
| General OPHI | 152 | 37,246.00 | (741.96) | 2,980.44 | 31,142.00 | (758.94) | 2,457.87 | 112,556.66 | 95,737.66 |
| ENT | 154 | 189,620.00 | (13,850.08) | 13,345.71 | 129,372.00 | (7,084.64) | 9,235.61 | 332,876.13 | 195,940.21 |
| Dental | 160 | 0.00 | 0.00 | 0.00 | 1,950.00 | 0.00 | 165.75 | 1,950.00 | 1,950.00 |
| Drapes | 116 | 26,883.00 | (878.21) | 2,063.60 | 26,598.00 | (826.21) | 2,053.53 | 147,284.78 | 147,249.28 |
| Ophthalmology | 153 | 86,314.00 | (4,527.12) | 6,374.92 | 1,714.00 | 0.00 | 145.70 | 333,002.88 | 256,657.00 |
| Neuro | 155 | 189,002.00 | (84,658.00) | 4,430.61 | 566,327.00 | (87,915.23) | 31,280.03 | 668,391.25 | 1,281,826.79 |
| OB&GYN | 157 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 257.00 | 23,693.00 |
| ENT Office | 124 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 149,656.00 | 19,400.00 |
| Used Equipment | 159 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,000.00 | 0.00 |

## Year to Date Values

| Returns | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 663 | (2,739.00) | 98.50 | (131.19) | (19,951.00) | 568.50 | (1,554.22) | (291,298.86) | (298,990.15) |
| Totals | 545,905.00 | (84,788.67) | 30,475.29 | 739,231.00 | (96,018.82) | 43,980.94 | 1,551,066.48 | 1,786,038.08 |

**Goal Achievement Bonus Table**

Your yearly goal and performance reflect all orders, including those you place and those of your customers.

| | | SPIFs |
|---|---|---|
| Goal Achievement | Commission Incentive | |
| $0 to < $25999999 | 0.000% | |
| 25000000 to < 35999999 | 0.33% | |
| 35000000 to < 55999999 | 0.65% | |
| 55000000 to < 65999000 | 0.65% | |
| > 65650000 | 1.00% | |

The Commission Incentive will be applied to all commissions earned during the fiscal year.

## Monthly Percent to Goal

Your YTD Net Order figure used for attainment calculation is $1554026.48. You are 25.7% to your yearly goal.

$500,000
$400,000
$300,000
$200,000
$100,000
$0

Jul Aug Sep Oct Nov Dec Jan Feb Mar Apr May Jun

■ Monthly Orders □ Monthly Goal — YTD Orders vs Yearly Goal

0%   25%   50%   75%   100%   125%

Curr Year vs. Prev Year YTD Percent to Goal

0%   25%   50%   75%

Jul Aug Sep Oct Nov Dec Jan Feb Mar Apr May Jun Jul Aug Sep

—■— Prev YTD Orders vs YTD Goal  —◆— Curr YTD Orders vs YTD Goal

## Comments

Administration Fees are not subtracted from your Total Commissions until the last month of the quarter.

 

April 25, 2003

Attention Eric Timko ; C.C. Michael Sodini,

Eric ,
Our brief conversation of Friday morning found me at a complete and utter loss, and finds me now still in a state of stunned disbelief.

I am mystified, and reeling, not only from the unexpectedness of this call, but also as to from what source, any allegations, innuendos, grievances etc. might have originated.

Even more to the point, what possible wrongdoing or shortfall could be laid at my door? Mac Surgical is a transparent company, built upon ethics . I would like nothing more than to answer any and all questions , and address whatever accusation is directed my way . The sooner the better !

My doors, my documents, all records, for all of my manufacturers, including Personal Bank Statements, phone records , equipment , automobile , home , are all thrown open to you . I would be pleased to submit to polygraph if necessary.

You will have full cooperation from myself and each and every person connected to my organization in whatever investigation, the more thorough, the better, that you would like to conduct.

No one would like to get to the bottom of this matter more than myself. As you know from my previous entanglement with Mr. Sonnenberg nothing , aside from my wife and child , is more precious to me than my good name . Nothing , except for my word , which I have given to eight households, including my own ( 25 people , including dependents) who look to me for their livelihoods , and their mortgages.

Although I am sorely wounded at not being able to participate in the Pre Convention Meeting, I fully understand, support , and honor your decision to bar my attendance , in light of the Confidentiality of the Topics. You must know, however, that this causes me untold distress , to exist under a cloud , which I can assure you , will not stand before the light of truth .

You have my gratitude for informing me of this allegation , and my trust that I will be given the opportunity to answer these charges . They will be answered.

Respectfully ,

Michael Campagna (800) 206-7112

"PLEASE CALL UPON AND COUNT UPON OUR BEST EFFORTS ON YOUR BEHALF"

1142 CHICAGO AVENUE SUITE 2N
OAK PARK. IL 60302

EXHIBIT
13

PHONE
301 FAX

MAY 21 '03  01:19PM 914-681-7418                                    P.1

Eric Timko
President



Carl Zeiss Surgical, Inc.
One Zeiss Drive
Thornwood NY 10594

914.681.7700

Fax 914.681.7418

etimko@zeiss.com

www.zeiss.com

May 21, 2003

TO : Michael Campagna

From: Eric Timko

2 total pages

CONFIDENTIAL !



EXHIBIT
14

MAY 21 '03  01:19PM 914-681-7418                                          P.2

Via Facsimile & FedEx

**ZEISS**

May 21, 2003

MAC Surgical, Inc.
811 North Harlem
Suite 2N
Oak Park, Illinois  60302
Attn.:  Mr. Michael A. Campagna
        President

Carl Zeiss Surgical, Inc.
One Zeiss Drive
Thornwood NY 10594

800.442.4020

Fax 800.882.1554

surgical@zeiss.com

www.zeiss.com

Re: Distributor Relationship

Dear Michael,

As we discussed this afternoon, over the preceding months, MAC Surgical has failed to meet its minimum sales requirements. Of even greater importance, I have received numerous reports of incidents that represent breaches of contractual obligations regarding business ethics. Specifically, there have been reports of excessively strained relations with customers, and your own sales representatives. When taken in combination, it has become apparent that the relationship between our companies is not the one which was intended, nor one in which we can continue.

Therefore, based upon the foregoing and for other good business reasons, Carl Zeiss Surgical, Inc., by this letter serves notice that it is terminating with immediate effect the Distribution Agreement with MAC Surgical, Inc., dated June 1, 2002.

The facts presented require that we exercise the immediate termination option. However, in order to make this parting an amicable one, we are willing to extend order commissions on any forwarded quotes that result in orders within sixty (60) days from the date of termination. We extend this offer because we believe it is appropriate to make payment for services provided, and we expect that you will in turn honor your commitments to the sales representatives who generated those orders. This is a difficult situation and we would like to minimize any potential negative exposure to Zeiss and to MAC Surgical. If you agree to these terms, please send this letter with your signature below along with your open quotes no later than 5 pm EST Friday.

Mike, I want you to understand that this was a difficult decision, made only after careful and objective consideration of the facts. I believe it would be in the best interests of both our companies if we can work to manage this transition in as amicably and professionally as possible.

On behalf of Carl Zeiss Surgical, Inc., I wish you all the best in all your future endeavors.

Sincerely,

Carl Zeiss Surgical, Inc.,                    MAC Surgical, Inc.,

By: _____                   By: _____
    Eric Timko                                     Michael A. Campagna
    President                                       President

                                              Date: _____



11/18/03

Attention: Eric Timko

Eric,

It seems that in recent days Carl Zeiss has accessed my Bank Account, without my consent, on two occasions, and that funds were deposited.

I am unsure as to why this was done, and am returning said funds.

Cordially,

Michael Campagna, Mac Surgical

PLEASE CALL UPON AND COUNT UPON OUR BEST EFFORTS DAILY

MICHAEL CAMPAGNA    PRESIDENT    MAC SURGICAL                    PAGER 80

EXHIBIT
15

## OFFICIAL CHECK

**SERVICE INSTRUCTIONS:**
FOR STOP PAYMENTS, PHOTOCOPIES OR ANY OTHER SERVICE REQUIREMENT,
CONTACT INTEGRATED PAYMENT SYSTEMS INC. AT 1-800-223-7520.

# CITIBANK

CITIBANK, FEDERAL SAVINGS BANK, CHICAGO, IL

**8472010720**

10-86
220

FC# 050 FA# 002          $0.00 ONL PIC          1 1 / 1 8 / 0 3
069-04 CK. SER.#   8472010720   * * * * * 2 1 , 1 6 9 . 1 9 * * * *

****TWENTY-ONE THOUSAND ONE HUNDRED SIXTY-NINE
AND 19/100 DOLLARS****

****Carl Zeiss Inc ****

NON NEGOTIABLE

MAC surgical

Issued by Integrated Payment Systems Inc., Englewood, Colorado
To Citibank (New York State): Buffalo, N.Y.

**TERMS**
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION, TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THE INSTRUMENT.

FOR YOUR PROTECTION SAVE THIS COPY

REMITTER COPY



Carl Zeiss, Inc.
Surgical Products Division
One Zeiss Drive
Thornwood NY 10594

800.442.4020
Fax 800.882.1554
surgical@zeiss.com
www.zeiss.com

November 24, 2003

Michael Compagna
MAC Surgical
211Clinton Avenue
Oak Park, IL  10302

Dear Michael,

Enclosed please find the check which you returned to Carl Zeiss Surgical, Inc. on November 18, 2003.

The check was deposited into your account at Citibank via ACH (Automated Clearing House).  This process was set up on April 14, 2003 per your request.  I have attached a copy of said request for your reference.

The funds were deposited into your account for your final commission payment.  I have attached a copy of your final commission report for your reference.

If you have any questions please feel free to contact me at 914.681.7764 and I will help in any way possible.

Regards,

Angela M. Krafka
Sales Analyst

Enclosures:     Bank Check # 8472010720
                Final Commission Report
                Application for ACH

EXHIBIT
16



11/18/03

Attention: Eric Timko

Eric,

It seems that in recent days Carl Zeiss has accessed my Bank Account, without my consent, on two occasions, and that funds were deposited.

I am unsure as to why this was done, and am returning said funds.

Cordially,

Michael Campagna, Mac Surgical



APR 1 4 2003

V#19231

**Carl Zeiss, Inc.
One Zeiss Drive
Thornwood, NY 10594**

## SUPPLIER ACH APPLICATION

### DIRECTIONS

*By filling out this form, you are requesting that Carl Zeiss, Inc. pay your invoices via an electronic funds transfer system. Please complete and sign this form, attached a voided blank check and mail to: Carl Zeiss, Inc., One Zeiss Drive, Thornwood, NY, 10594, ATTN: Accounts Payable - ACH. If you have any questions please contact Inge Driscoll at 914-681-7609.*

| | |
|---|---|
| Company name | MAC SURGICAL INC. |
| E-Mail address | MAC SURGICAL@AMERITECH.NET |
| Address | 1142 CHICAGO AVENUE, SUITE 2 N. |

| City | State, Zip |
|---|---|
| OAK PARK | IL 60302 |
| **Contact name** MICHAEL CAMPAGNA | **Phone Number** (708) 386-9020 |
| **Authorized Signature** | **Date** |

VOID

$

DOLLARS

**DO NOT WRITE BELOW THIS LINE**

| A/B No | Routing No | Account No | Entered |
|---|---|---|---|
| | | | |



# ZEISS

# Carl Zeiss Surgical Incentive Report - Line Item Detail
## June 2003

| Order Number | Type | Invoice Number | Trans Date | Customer Name | Prod Line | Line Item | Ship ZIP | Item Number | Item Description | Qty | Price | Extended Price | Comm Rate | Base Commission |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 124-300100 | Booking | | 06/09/03 | Wisconsin Rapids Center | 124 | 0001 | 54494 | 000000725000000 | Opmi PicoS100 Floorstand | 2 | $9,700.00 | $19,400.00 | 7.5% | $1,455.00 |
| 124-300100 | Booking | | 06/09/03 | Wisconsin Rapids Center | 124 | 1000 | 54494 | 129500003500000 | Special Discount | -1 | $1,000.00 | ($1,000.00) | 25.0% | ($250.00) |
| | | | | | | | | | Orders SubTotals | | | $18,400.00 | = | $1,205.00 |
| 124-300103 | Booking | | 06/11/03 | Monroe Clinic | 124 | 0001 | 53565 | 00014000000000 | Opmi PicoS100 W Mount | 2 | $9,700.00 | $19,400.00 | 7.5% | $1,455.00 |
| 124-300103 | Booking | | 06/11/03 | Monroe Clinic | 124 | 1000 | 53565 | 129500003500000 | Special Discount | -1 | $823.00 | ($823.00) | 25.0% | ($205.00) |
| 124-300103 | Booking | | 06/11/03 | Monroe Clinic | 124 | 0002 | 53565 | NAT ACCT | National Account Discount-Clr | -1 | $776.00 | ($776.00) | 25.0% | ($194.00) |
| 124-300103 | Booking | | 06/11/03 | Monroe Clinic | 160 | 0001 | 53565 | 311201000000000 | S100 Mounting W/Ball Boat | 2 | $1.00 | $1.00 | 8.5% | $0.10 |
| 124-300103 | Booking | | 06/09/03 | Monroe Clinic | 124 | 0003 | 53565 | 208000252000000 | Opmi PicoS100 Wall Mount | 2 | | $9,700.00 | | $727.50 |
| | | | | | | | | | Orders SubTotals | | | | | |
| 124-300103 | Booking | | 06/20/03 | Monroe Clinic | 124 | 0008 | 53565 | 208000252000000 | Opmi PicoS100 Wall Mount | 2 | $3,700.00 | $3,700.00 | 7.5% | ($1,465.00) |
| 124-300103 | Booking | | 06/20/03 | Aurora Clinic | 124 | 0001 | 53565 | 208000252000000 | Opmi PicoS100 Wall Mount | 2 | $3,700.00 | $3,700.00 | 7.5% | $272.50 |
| 355-300206 | Booking | | 06/21/03 | St Vincent's Hospital | 152 | 0003 | 54301 | 000000140000000 | 100sq. Optical Wedge | 1 | $13,002.00 | $13,002.00 | 8.5% | $989.82 |
| 355-300206 | Booking | | 06/21/03 | St Vincent's Hospital | 155 | 0002 | 54301 | 016810000000000 | 20X Access Pkg. Incl/Stereo/Dr | 1 | $17,000.00 | $17,000.00 | 8.5% | $1,445.00 |
| 355-300206 | Booking | | 06/19/03 | St Vincent's Hospital | 155 | 0001 | 54301 | 000000190007000 | Opmi NeuroRed W/Autoflator | 1 | $230,000.00 | $230,000.00 | 8.5% | $17,255.00 |
| 355-300206 | Booking | | 06/17/03 | St Vincent's Hospital | 155 | 0001 | 54301 | 000000190007000 | Opmi NeuroRed W/Autoflator | 1 | $230,000.00 | $230,000.00 | 8.5% | $17,255.00 |
| 514-300107 | Stocking | | 06/19/03 | St Vincent's Hospital | 155 | 0002 | 53708 | 000000108007000 | Special Discount | -1 | $150.00 | ($150.00) | 25.0% | ($37.50) |
| 355-300206 | Booking | | 06/17/03 | St Vincent's Hospital | 555 | 0004 | 54301 | NAT ACCT | National Account Discount-Clr | -2 | $11,856.00 | $11,856.00 | 25.0% | $11,245.00 |
| | | | | | | | | | Orders SubTotals | | | $11,856.00 | = | ($2,765.66) |
| 514-300107 | Booking | | 06/18/03 | Rush North Shore Med Center | 514 | 0003 | 60078 | 000049103140309 | Medline T Coil Mono Nsc Camera | 1 | $14,500.00 | $14,500.00 | 8.5% | $14,028.17 |
| 514-300107 | Booking | | 06/18/03 | Rush North Shore Med Center | 514 | 0007 | 60078 | 201681000500000 | Video Chip Infin 80/240-082 | 1 | $14,500.00 | $14,500.00 | 8.5% | $1,232.50 |
| 544-300107 | Booking | | 06/18/03 | Rush North Shore Med Center | 155 | 0001 | 60078 | 000001940000000 | Xion 1SA-57 Stand | 1 | $43,200.00 | $43,200.00 | 8.5% | $26.75 |
| 514-300107 | Booking | | 06/18/03 | Rush North Shore Med Center | 514 | 0002 | 60078 | 000001940754000 | Camera Cable 6x4.6 2x1 | 1 | $1,100.00 | $1,100.00 | 8.5% | $375.75 |
| 514-300107 | Booking | | 06/18/03 | Rush North Shore Med Center | 514 | 0005 | 60078 | 000049107000000 | Special Discount | -1 | $150.00 | ($150.00) | 25.0% | ($37.50) |
| 555-300240 | Booking | | 06/18/03 | St Vincent's Hospital | 555 | 0004 | 54301 | NAT ACCT | National Account Discount-Clr | -1 | $11,856.00 | $11,856.00 | 25.0% | $11,245.00 |
| | | | | | | | | | Orders SubTotals | | | $11,856.67 | = | $14,405.17 |
| 514-300102 | Booking | | 06/18/03 | Am Surgery Center | 152 | 0002 | 60018 | 329001991000000 | 887 Acces. Pkg. Bx200Stereo/x | 1 | $91,141.00 | $91,141.00 | 7.5% | $1,238.87 |
| 555-300324 | Booking | | 06/09/03 | Am Surgery Center | 155 | 0003 | 60018 | 201681000500000 | Video Chip Infin 80/240-082 | 1 | $39,000.00 | $39,000.00 | 8.5% | $1,650.00 |
| 555-300324 | Booking | | 06/09/03 | Am Surgery Center | 153 | 0001 | 60018 | 000000190640000 | Xion 1SA-57 Stand | 2 | $43,300.00 | $86,600.00 | 8.5% | $7,361.00 |
| 553-300324 | Booking | | 06/09/03 | Am Surgery Center | 553 | 0006 | 60435 | NAT ACCT | National Account Discount-Clr | -1 | $14,000.00 | ($14,000.00) | 25.0% | ($3,245.00) |
| | | | | | | | | | Orders SubTotals | | | $112,502.00 | = | $6,194.50 |
| 553-300339 | Booking | | 06/30/03 | Sarah Bush Lincoln Health Cr | 124 | 0002 | 61003 | 208001091900000 | 901 Acces. Pkg. Bx80Stereo/D | 1 | $8,500.00 | $8,500.00 | 7.5% | $530.00 |
| 553-000338 | Booking | | 06/30/03 | Sarah Bush Lincoln Health Cr | 133 | 0001 | 61038 | 000001110540000 | Vitax 1SA-57 Stand | 1 | $43,300.00 | $43,300.00 | 8.5% | $3,680.50 |
| 553-000338 | Booking | | 06/20/03 | Sarah Bush Lincoln Health Cr | 153 | 0004 | 61038 | 360720000000002C | Objective F=175Am/0.84m CW | 1 | $400.00 | $400.00 | 25.0% | $130.00 |
| 553-100339 | Booking | | 06/20/03 | Sarah Bush Lincoln Health Cr | 553 | 000C | 61038 | NAT ACCT | National Account Discount-Clr | -1 | $3,100.00 | ($3,100.00) | 25.0% | ($777.00) |
| | | | | | | | | | Orders SubTotals | | | $49,093.00 | = | $3,475.50 |
| 554-400024 | Booking | | 06/24/03 | Central DuPage Hospital | 0001 | | DIS | Special Account | -1 | $20,042.01 | $20,042.01 | 25.0% | $5,241.90 |
| 554-400024 | Booking | 24002534 | 06/24/03 | Central DuPage Hospital | 0001 | | DIS | Special Account | -1 | $20,042.01 | $20,042.01 | 25.0% | $5,241.90 |
| 554-400024 | Invoicing | 24002534 | 06/24/03 | Central DuPage Hospital | 555 | 0001 | DIS | Special Discount | -1 | $26,047.51 | ($26,047.51) | 25.0% | ($5,211.90) |
| | | | | | | | | | Orders SubTotals | | | ($26,047.51) | = | ($5,211.90) |

**Total  $24,169.74**



# MAC SURGICAL

## STRIVING FOR EXCELLENCE

December 4, 2003

Eric Timko
Carl Zeiss, Inc.
Surgical Products Division
One Zeiss Drive
Thornwood, NY 10594

Dear Eric:

Enclosed please find a check from MAC Surgical to Zeiss for $21,169.19. I am returning such funds because Zeiss is to provide me with sixty (60) days of commission payments, until July 20, 2003. Zeiss has only provided me with commission payments for June 2003, as shown in the June 2003 commission report, and has indicated that such payment is a "final" payment. I cannot accept such payment as "final" because I am also due commission payments for July 2003 also.

I look forward to receiving a commission payment from Zeiss that includes payment for sixty (60) days from the date of May 21, 2003.

Sincerely,

Michael Campagna
MAC Surgical

Enclosure

**EXHIBIT**

**17**



121040240231 New 11/01

**OFFICIAL CHECK**

# CITIBANK

CITIBANK, FEDERAL SAVINGS BANK, CHICAGO IL

**PAY** \*\*\*\*TWENTY-ONE THOUSAND ONE HUNDRED SIXTY-NINE
AND 17/100 DOLLARS\*\*\*\*

TO
THE
ORDER
OF      \*\*\*CARL ZEISS INC.\*\*\*

NAME OF REMITTER
ADDRESS       H&C SURGICAL

**OFFICIAL CHECK**

DRAWER: CITIBANK, FEDERAL SAVINGS BANK

BY
AUTHORIZED SIGNATURE

847 2016 594

⑈0 ⅈ 2000858⑈: 28" 14034ⅈ 847 201659

THE VARIABLE TONE BACKGROUND AREA OF THIS DOCUMENT CHANGES COLOR GRADUALLY AND SMOOTHLY FROM DARKER TONES AT BOTH TOP AND BOTTOM TO THE LIGHTEST TONE IN THE MIDDLE

Civil Cover Sheet

JUDGE NORGLE Page 1 of 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

MAGISTRATE JUDGE BOBRICK

## Civil Cover Sheet 04C 0854

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

DOCKETED
FEB 0 4 2004

**Plaintiff(s): MAC SURGICAL, INC., an Illinois Corporation, and MICHAEL CAMPAGNA, an Individual**

County of Residence: Cook County, Illinois

Plaintiff's Atty:　　See Attachment

**Defendant(s):CARL ZEISS SURGICAL, INC., a New York Corporation, and ERIC TIMKO, an Individual**

County of Residence: Westchester County, New York

Defendant's Atty:

---

II. Basis of Jurisdiction:　　　　**4. Diversity (complete item III)**

III. Citizenship of Principal Parties
(Diversity Cases Only)

Plaintiff:-**1 Citizen of This State**
Defendant:-**2 Citizen of Another State**

IV. Origin :　　　　　　　　　**1. Original Proceeding**

V. Nature of Suit:　　　　　　**890 Other Statutory Actions**

VI.Cause of Action:　　　　　**28 U.S.C. Section 1332 (Diversity); 815 ILCS 705, et seq. (Violations of Illinois Franchise Disclosure Act) and related causes**

VII. Requested in Complaint
　　　Class Action:**No**
　　　Dollar Demand:**In excess of $75,000**
　　　Jury Demand:**Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

---

Signature: _____

Date: 2-4-04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** Revised: 06/28/00

**Plaintiff's Attorneys**

Ronald K. Gardner
Erika N. Donner
Dady & Garner
4000 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 359-9000
(612) 359-3507 - Fax


Gary W. Leydig – Local Counsel
Worker, Sitko & Hoffman, LLC.
150 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
(312) 345-1718
(312) 345-1778 - Fax

JUDGE NORGLE

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
MAGISTRATE JUDGE BOBRICK

EASTERN DIVISION

In the Matter of

MAC SURGICAL, INC., an Illinois corporation, and MICHAEL CAMPAGNA, an individual,
          Plaintiffs,
vs.
CARL ZEISS, a New York Corporation, and ERIC TIMKO, an individual,
          Defendants.

Case Number: **04C 0854**

DOCKETED
FEB 0 4 2004

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

MAC SURGICAL, INC., an Illinois corporation, and MICHAEL CAMPAGNA, an individual, Plaintiffs

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Ronald K. Gardner | NAME Erika N. Donner |
| FIRM Dady and Garner, P.A. | FIRM Same as attorney (A) |
| STREET ADDRESS 4000 IDS Center, 80 S. 8th Street | STREET ADDRESS |
| CITY/STATE/ZIP Minneapolis, MN 55402 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 612-359-9000 / FAX NUMBER 612-359-3507 | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS rkgardner@dadyandgarner.com | E-MAIL ADDRESS edonner@dadyandgarner.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☑ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME Gary W. Leydig | NAME |
| FIRM Worker, Sitko & Hoffman, L.L.C. | FIRM |
| STREET ADDRESS 150 N. Wacker Drive, Ste 3100 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312-345-1718 / FAX NUMBER 312-345-1778 | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS gwleydig@wshlawfirm.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 3128377 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☑ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☑ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☑ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |